243 P.3d 289

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Lloyd PRATT, Defendant–Appellant.**

**Nos. 27897, 27898, 27899.**

Intermediate Court of Appeals of Hawai'i.

Nov. 18, 2010.

Daniel G. Hempey (Elif Z. Yarnall with him on the brief), for Defendant–Appellant.

Tracy Murakami, Deputy Prosecuting Attorney (Craig A. De Costa, Prosecuting Attorney, with her on the brief), for Plaintiff–Appellee.

LEONARD, J.; FUJISE, J., concurring; and NAKAMURA, C.J., concurring and dissenting.

## Opinion of the Court by LEONARD, J.

In this case, Defendant–Appellant Lloyd Pratt (**Pratt**) argues that as a native Hawaiian he has a constitutionally protected right to, *inter alia*, take up residence in a State wilderness park in Kalalau Valley on the Island of Kaua'i as part of and in order to facilitate his exercise of customary and traditional native Hawaiian practices and to act as a "hoa'aina" or caretaker of the land and restorer of ancient Hawaiian sites. Based on this assertion (and other arguments discussed herein), Pratt contends that this court must reverse three judgments entered on June 16, 2006 (**Judgments**), in the District Court of the Fifth Circuit (**District Court**),[1] on Pratt's convictions for violating restrictions on camping in closed areas of Kalalau State Park pursuant to Hawaii Administrative Rules (**HAR**) § 13–146–4 (1990).

For the reasons discussed below, we reject Pratt's arguments and therefore affirm his convictions.

## I. The Record in this Case

### A. Procedural History

Pratt was charged with three violations of HAR § 13–146–4, which provides, in relevant part:

> § 13–146–4. **Closing of areas.**
>
> (a) The board [of land and natural resources] or its authorized representative may establish a reasonable schedule of visiting hours for all or portions of the premises and close or restrict the public use of all or any portion thereof, when necessary for the protection of the area or the safety and welfare of persons or property, by the posting of appropriate signs indicating the extent and scope of closure. All persons shall observe and abide by the officially posted signs designating closed areas and visiting hours.

Pratt was cited on three separate occasions for "camping" in a closed area in violation of HAR § 13–146–4, when he was found residing in a closed area of Kalalau State Park.

On August 13, 2004, Pratt filed *pro se* a "Constructive Notice and Demand" requesting that two of the citations against him be dismissed[2] based on what appears to be assertions that: (1) Kalalau Valley is a "U.S. Military Occupied Region" within the "Country and the Islands of Hawai'i;" (2) the Ambassador of the Country of Hawai'i, L.K. Kupihea, bequeathed the title of "Resident Kahu" over Kalalau Valley to Pratt; (3) L.K. Kupihea declared Pratt to be the "Allodial land steward" under certain purported United Nations resolutions; and (4) L.K. Kupihea declared and permitted Pratt "Permanent Structural Building Rights" in Kalalau Valley.

The State filed a memorandum in opposition to Pratt's August 13, 2004 motion to dismiss, essentially arguing that the Country of Hawai'i does not exist and that the District Court had proper jurisdiction in the case. Pratt's August 13, 2004 motion to dismiss was denied, and the case was set for a consolidated trial on all three citations.

On January 19, 2005, Pratt filed *pro se* a second motion to dismiss,[3] which asserted that the charges against him violated his rights under the "First Amendment to the United States Constitution to engage in traditional and customary practices (religion)," article XII, § 7 of the Hawai'i Constitution, and HRS §§ 7–1 and 1–1. Pratt again asserted that he was a native Hawaiian "residing" in Kalalau Valley "to clean, clear, repair, build, and plant upon the undeveloped land that is a traditional cultural property to use for ceremonial purposes that are rooted in Hawaiian tradition and custom." With the second motion, Pratt filed legal memoranda citing, *inter alia*, the Hawai'i Supreme Court's *Kalipi*, *PDF v. Paty*, *PASH*, and *Hanapi* decisions cited and discussed herein.

---

1. The Honorable Frank D. Rothschild presided.

2. The third citation post-dated the August 13, 2004 motion to dismiss.

3. The January 19, 2005 motion to dismiss also contained a motion to suppress evidence.

Prior to the hearing on Pratt's second motion to dismiss and consolidated trial, Pratt filed a motion for appointment of new counsel, alleging that the public defender refused to present his native Hawaiian rights defense. Pratt's motion was granted and private counsel was appointed. Through counsel, Pratt filed a request to incur expenses for expert witnesses, which was granted in part, allowing Pratt to incur certain expenses related to the testimony of Davianna McGregor, Ph.D., a well-respected Professor of Ethnic and Hawaiian Studies at the University of Hawai'i, Manoa (**Dr. McGregor**).

After new defense counsel was appointed, on September 21, 2005, Pratt filed (through counsel) a third motion to dismiss.[4] The third motion to dismiss argued that as a native Hawaiian, a kahu or religious practitioner who is licensed in the State of Hawai'i to perform marriages, and in his role as a hoa'aina or caretaker of land, as part of his traditional practice, Pratt travels to Kalalau Valley to tend the heiau there, to perform cultural ceremonies, to clear and repair the ancient terraces, and to replant native flora species. An evidentiary hearing was held and the issues were extensively briefed by both Pratt and the State, before and after the hearing, which was held on November 4, 2005. On March 10, 2006, the District Court entered a Decision & Order on Defendant's Motion to Dismiss, denying Pratt's motion to dismiss.[5] On April 12, 2006, the District Court held a trial on stipulated facts (i.e., facts which were agreed to by the parties), found Pratt to be guilty of the charges, sentenced Pratt to 20 hours of community service for each offense (stayed pending appeal)

and entered judgment.[6] Pratt timely filed a notice of appeal from the judgment. On May 15, 2006, the District Court entered Findings of Fact & Conclusions of Law.

### B. Testimony and Evidence on Pratt's Motion to Dismiss

As noted above, in his motion to dismiss, Pratt argued that his conduct constituted the exercise of native Hawaiian rights protected under the Hawai'i Constitution. As discussed further below, whether Pratt's conduct was constitutionally protected is purely a legal issue for determination by the courts. However, as discussed more fully below, Pratt had the burden to demonstrate that his conduct fell within the scope of the constitutional protection. To meet this burden, Pratt had to bring forward sufficient evidence to satisfy, at a minimum, three legal criteria: (1) that he was a native Hawaiian; (2) that his claimed right is constitutionally protected as a customary or traditional native Hawaiian practice as codified—but not necessarily enumerated—in article XII, § 7 of the Hawai'i Constitution, HRS §§ 1–1 and/or HRS § 7–1; and (3) that the exercise of the right occurred on undeveloped or less than fully developed property. Thus, it is helpful to consider the evidence, to the extent practicable, in the framework of these criteria.

#### 1. Pratt's Native Hawaiian Heritage

Pratt testified that he was born in Waimea town on the island of Kaua'i. His father was from Oahu and his mother was from the Big Island. The evidence before the District Court included a genealogy reviewed and certified by the Department of Hawaiian

---

4. The record is unclear regarding whether the District Court ruled on Pratt's second motion to dismiss. Neither the hearing transcripts nor the written decisions of the court refer specifically to either the second or third motion to dismiss. Given the extensive briefing, evidentiary hearing, and arguments made, we will treat the District Court's orders as disposing of the issues raised in both of these motions to dismiss.

5. Although the file-stamped date is March 10, 2006, the judge's signature line is dated February 27, 2006, and the decision is later referred to as the February 26, 2006 decision on the motion to dismiss and incorporated into the District

Court's Findings of Fact & Conclusions of Law entered on May 15, 2006.

6. At sentencing, the District Court noted that Pratt had been previously convicted on similar charges. Although the number of prior citations and convictions is unclear, Pratt submitted pleadings from a prior case involving nine citations. However, the District Court declined to fine Pratt and imposed a minimal number of community service hours per offense because it made "a huge difference" to the District Court that Pratt was "trying to test the law" and not just disrespecting the decisions of the court and the rules of the State.

Home Lands, which identified Pratt as 75% Hawaiian.

The genealogy identified Pratt's mother, Myrtle L. Kaapana, as well as his maternal grandparents David Kaapana and Caroline Kahananui, as 100% Hawaiian. No great-grandparents or great-great grandparents were indicated on his maternal side.

The genealogy did not specify a percentage of Hawaiian blood for Pratt's father, Merlyn Pratt, but identified each of his paternal grandparents, Edward K. Pratt and Rose L. Larsen, as 50% Hawaiian. Edward K. Pratt's parents are identified as Thomas Pratt, no blood quantum specified, and what appears to be Nahili, M., 100% Hawaiian. Rose L. Larsen's parents are identified as Charles N. Larsen and what appears to be Hattie Puneamina, with no blood quantum specified for either one. No further ancestry was indicated.

Pratt was asked whether any of the people identified in the genealogy were buried in Kalalau Valley. He answered: "No, because part of my family is actually from the Big Island, from Ka'u, and my dad was fully from Oahu." Pratt maintained, however, that his "ancestors" are buried in Kalalau Valley. Pratt was asked further questions about his alleged ancestral connections to Kalalau Valley:

Q:  Do you know of anybody at all from your lineage, if we were to look even the next level back, is anybody buried in the Kalalau Valley?

A.  Yes, they are. In the Kupihea family which actually is tied with my family.

Q.  Well, that was going to be my next question. Who is the Kupihea family and how is your family—

A.  It starting through my dad line. [sic]

Q.  I don't see him listed on this—

A.  If you look at—yeah, we didn't have to go and show proof for the Hawaiian Homelands. It was only to show blood quantum. So if we went back, further back in genealogy, then the Kupihea comes

under Wailali'i which is actually my great, great grandmother.

Q.  Her name was Kupihea?

A.  No, her name is Waiali'i, but not Kupihea. It is a family line. If you [are] looking way back in the old, our family names is not only just Kupihea. It goes from Kupihea to Waila, to this, to that. It adds a long name like this.

When the territory came and the State also came, then it changed. Also when religion or Christianity came about, they broke up our family line by you had to pick either like, let's say Hanohanopa is another issue here. Today it's Pa as a family, and Hanohano is a family. Which actually, no, they are one family.

So from Christianity to territory to now statehood our families has been disbursed, moved. Meaning that identities have changed.

Q.  All right. So I guess my question then is, how is this Court to know that you and your family are tied into Kupihea?

A.  I'm just telling you right now that it is through my dad line.

### 2.  Evidence relating to Pratt's asserted native Hawaiian rights

As discussed and analyzed below, constitutionally protected customary and traditional native Hawaiian access and gathering rights may stem from the lawful occupancy within an ahupua'a or from other ancient "Hawaiian usage" that might have extended beyond the ahupua'a, if such usage customarily and traditionally extended outside the ahupua'a to another part of the island. Such customary and traditional rights may include the right to enter certain lands owned by others for water, access, and gathering necessary for subsistence, cultural or religious purposes.[7] In this context, the evidence related to Pratt's asserted native Hawaiian rights is reviewed.

### a.  Pratt's ties to the ahupua'a of Kalalau

Pratt did not submit testimony or other evidence that he was the owner or lawful

---

7.  These rights, including the circumstances in which they may or may not be exercised, are

discussed in greater detail below, in the discussion of Pratt's arguments.

tenant of kuleana or other lands in Kalalau Valley. As quoted above, Pratt testified that his family was "tied with" the Kupihea family. Pratt submitted into evidence an exhibit entitled *An Archaeological Reconnaissance Survey: Na Pali Coast State Park, Island of Kaua'i*, which was authored by Myra Jean F. Tomonari–Tuggle for the Department of Land and Natural Resources and the County of Kaua'i, dated September 1989 (**Archaeological Survey**). In his direct testimony, Pratt referenced a chart at page 37 of the Archaeological Survey, which is labeled "Table 2: Land Use in Kalalau, Pohakuao, and Honopu, 1856–1857" and references, among 24 grants, Grant 2418, to "Kupihea," in the ahupua'a of Kalalau, with an area of 2.94 acres, for a purchase price of $8.00. When asked by his counsel what that signifies, Pratt stated: "Ah, that was a lot. That was the grant number with who was given the grant, where was given, and how big it was, and it's tied in with my family."

The District Court questioned Pratt further on his connection to Kalalau Valley:

Q. Okay. Do you know of any family member that you can trace back to—

A. Yes, I do.

Q.—whether it's to great grandparents, or great, great grandparents, how far back would you have to go to find the family members-

A. There is a man—

Q.—that live[d] in the Kalalau—let me finish the question. That actually lived in Kalalau? How far back in this genealogy, if we could take it back, would we go before we would find that?

A. Ah, it actually on my great grandmother, Waiali'i, on that family line is also hooked up with Kupihea line, and so it would be at that time that they were living there.

Q. Would that have been the 20th century, the 19th century? When would that have been?

A. It would have been in the 1800s.

Although not specifically referenced by the parties, the Archaeological Survey reports that, during the second half of the 19th century, Kalalau Valley residents were a co-operative, community that had a "reciprocal, basically subsistence, fishing, farming orientation" and traded with people in Hanalei, Waimea, and Ni'ihau, for items such as coffee, matches, kerosene, and soap. The survey further reports that most of its residents left by the early 1900s and the valley was finally abandoned by human residents in 1919, except for visits by hunters, fishermen, and scientists. In the 1960s, "transient residents," mostly from the mainland United States, resided in the valley and reportedly modified Hawaiian terraces and habitation structures to conform to contemporary necessities. In 1974, the Division of State Parks acquired Kalalau Valley, evicted the transient residents, and established the valley as a wilderness park. The Archaeological Survey concludes, in part:

The archaeological reconnaissance survey ... fulfills two objectives: 1) it presents an inventory of cultural resources for portions of the Na Pali Coast State Park and 2) it assesses the impact of visitor use and feral animal populations on those cultural resources.

. . . .

Visitor impact is concentrated in areas of intensive use, such as campgrounds in ... Kalalau. . . . Activities, such as the digging of holes for outhouses, firepits, and garbage disposal, and the removal of stones from surface features for tent sites and camp fires, are the primary causes of site destruction.

. . . .

The management of archaeological sites on the Na Pali coast can be handled in conjunction with the maintenance of the wilderness nature of the State Park. Both are fragile resources and management requires limited access; any increase in visitor use beyond the present restrictions would result in detrimental impact on the archaeology. . . . [P]reservation is strongly advocated as the substance of cultural resources management in Na Pali Coast State Park.

The Na Pali coast is a valuable archaeological resource for an understanding of Hawaiian prehistory and adaptation. The extent and nature of the archaeology in the

State Park provide an incalculable resource for scientific investigations. But significance goes beyond an academic evaluation of importance. The Na Pali coast is of value to the people of Hawai'i as it represents a part of history and a way of life that once existed in these islands but is not now reproducible.

Pratt claims that his family was somehow tied into the Kupihea family and that one or more member(s) of the Kupihea family had received a land grant in Kalalau Valley in the 1850s. However, there was no other testimony or evidence regarding a connection between Pratt and the "Kupihea" referenced as a land grantee in the Archaeological Survey and no other evidence of ancestral occupation. There are no stipulated facts and no findings of fact related to a lawful or ancestral occupancy in Kalalau Valley. Nor are there any stipulations or findings concerning any relationship between Pratt and the Kupihea who is referenced in the Archaeological Survey as a Kalalau Valley land grantee. Also, as noted below, Pratt does not raise any points of error related to the District Court's findings of fact. Thus, the evidence of Pratt's ties to Kalalau Valley consists of Pratt's own experiences growing up on Kaua'i and traveling in and out of the valley throughout his childhood and adulthood, and his understanding that his paternal great grandmother's family line was in some way connected with the Kupihea that once lived in the valley. There is no indication of whether this connection was by blood, marriage, communal habitation, or some other relationship. Pratt also asserts that his constitutional right to reside in Kalalau Valley stems from traditional and customary native Hawaiian practices.

b. *Pratt's cultural and religious practices*

In a declaration in support of his motion to dismiss, Pratt averred, *inter alia:*

I am a "Kahu" or Hawaiian cultural practitioner.

Among other things, my duties and my culture as a Kahu include: cleaning and repairing ancient terraces and He'i'aus in the valley; explaining traditional and customary native Hawaiian practices to the island's visitors; helping people who are injured or sick and in the valley (including the use of Noni and other Native Hawaiian healing practices); performing cultural ceremonies in the Huna tradition ...; replanting native species including ti, hibiscus, ulu, and coconut; praying; playing music, and actively opposing desecration of the He'i'aus in the valley.

. . . .

While in Kalalau, I gathered and disposed of litter, cleared invasive flora, repaired the ancient terraces and He'i'aus in the Valley, performed religious ceremonies, replanted native plants, prayed, played music, protected the He'i'au from desecration and illegal campers and assisted visitors in understanding traditional and customary native Hawaiian practices in the valley.

I have also taught Hawaiian practices in several Hawaiian Studies programs at local schools on Kaua'i.

I have led children's immersion programs in the Kalalau Valley on the subjects of Hawaiian cultural and spiritual practices.

While performing my responsibilities as a Kahu, I must live in the valley. This necessarily involves staying overnight in Kalalau Valley. This is necessary for my duties and my culture as a Kahu. Kalalau valley is too remote and too inaccessible for me to do the required cleaning, building, repairing, planting and ceremonial practices without sometimes actually living in the valley.

(Paragraph numbering omitted.)

At the evidentiary hearing, Pratt testified that he has been taught traditional and customary native Hawaiian practices:

From a young boy all the way up to I was in my thirties ..., I've been taught huna. Huna is a spiritual living system that we use whether we are healers or whether we are mastering canoe building or whatever. It's a kahunaship, but I [was] taught huna. It's a spiritual side to heal people and also to do herbal medicines. I do a lot of that.

. . . .

I grew up with Hawaiians especially from Niihau because my parents lived in Pakala Robinson Sugar Plantation, and from there, then it's just by mingling with them because my dad drove the barge to Niihau, and from there just by living with them you get to learn it. And from there it carried on and carried on until in my, I'd say mid twenties, then another man from Waimea Valley, Kanakanui, William Kanakanui, who actually taught more and more. And then after that I was in my thirties and then I started learning from Alvin Kaiakapu. And from there then I'm on my own.

Pratt testified about his being a kahu:

Q. What is a kahu?

A. I'd say a kahu for me is—actually I'm a minister. In the eyes of the white man I'm a minister, a priest or a healer or a medicine man. I'm the same that's a kahu.

. . . .

Q. How do you get to be a kahu?

A. Ah, it's more recognition by the community. More than being certified in, get certificates and all this, it's just by living and learning it and the community knows me and would come to me and ask me if I could help them.

. . . .

Q. How about restoration, is part of your responsibility as a kahu restoring land?

A. Yes, it is.

. . . .

Q. How do you heal land?

A. It's actually putting [it] back into order again. But it was there by my ancestors because it has mana in it. It's to clean up the rubbish that is in there, meaning it broke up the mana that is on the heiaus, and especially because my ancestors are all buried on it. They're the caretakers to it.

. . . .

Q. . . . [D]oes the fact that your ancestors' bones and the mana in the valley have any relation to your position as a kahu?

A. Yes, it does.

Q. What is that?

A. Let's say it's to hold that mana there, instead of being desecrated. The land has never been taken care of since I've been going in there 37 years, which actually [to others would be a] temple or church. But the church has never been taken care of. It is then—it becomes our responsibility if no one else is going to do it, whether the State or the County, then it is our responsibility as a family of that area to take care of it.

Pratt testified that cleaning up the heiau, cutting the trees down, and taking away brush and rubbish was something that he feels he has a cultural and traditional obligation to do. Pratt further testified that part of his traditional and customary practices as a native Hawaiian is the planting of trees and plants and that he needed to set up a residence in Kalalau Valley to fulfill his cultural and traditional obligations. When asked why he needed to stay in the valley, he testified: [8]

Why? Because I am actually more like saying that I am caretaking the property, so let's say the valley. And I've become from a lumber jack to a policeman to everything that you can think of in a community. There's been incidents where someone got hurt. I was there to help them. Or maybe the trees fell down and the trails are blocked. There weren't any state workers there. I had the tools and went there to clean it.

Many years prior to the charges being brought in this case, in the early 1990s, Pratt had applied to the State for an "ambassadorship," essentially a permit to reside at Kalalau and engage in some of these activities. Pratt testified that someone else got the position.

---

8. Pratt also testified that he needs to stay in the valley at least two days because of the difficult access to the valley by hiking eight to ten hours over one of the most difficult trails in Hawai'i.

### c. *Dr. McGregor's Testimony*

After testifying as to her background and qualifications, Dr. McGregor testified that, in her opinion, Pratt was conducting practices or activities that were "consistent with traditional customary practices." Dr. McGregor testified that she has developed a standard for how to recognize what is a traditional and customary practice. As a framework, she said that she started with HRS § 7–1, HRS § 1–1, and article XII, § 7 of the Hawai'i Constitution, and then she formed her opinion about the "appropriate standard" through interviews conducted throughout the islands. Dr. McGregor testified that, in her opinion, the essential elements of traditional and customary practice are: (1) the practice must be related to extended family needs; the purpose must be to fulfill a responsibility related to subsistence, religious, or cultural needs of one's family or extended family; (2) the practitioner must be trained by an elder from a previous generation in a practice and custom that has been passed on from one generation to the next; "you can't make it up;" (3) it has to be conducted in an area that the person has a traditional connection to, either because of family that has lived there and assumed traditional responsibility for an area or because the person is part of a halau with an established traditional responsibility and connection to the area; (4) the practitioner has to be taking responsibility for an area to acquire the right of entry; the right of access has to be to fulfill a traditional responsibility that has been given to the practitioner by his or her family or the kumu of a halau; (5) the practice cannot be for a commercial purpose;[9] and (6) the manner in which the practice is conducted must be consistent with tradition and custom; in some cases, there is a protocol, a cleansing, or a chant, and the practice must be conducted in a respectful manner.

Dr. McGregor opined that Pratt's activities were "subsistence related, as well as cultural and religious." She testified that she was not an expert on huna, but identified it as a "religious tradition of training." Regarding

Pratt's training, she stated: "[Pratt] informed me that he went through a period of training with both Mr. Kaiakapu and Kanakanui." Dr. McGregor was satisfied that those people were elders or kumu because "[a]ccording to how he explained their training and his training under them [,] I had no reason to doubt that. But I haven't done individual investigation beyond that." Dr. McGregor was also satisfied with Pratt's "traditional connection" to Kalalau Valley because

Pratt informed me that he had—he was descended from ancestors who had lived in the valley by the name of Kupihea and that they had resided in the valley for an extended period of time and that in his youth he was—he would accompany—he was accompanied by his father who had been working with the Robinsons who had the lease at the time, and so he was brought there by his father, as well, who evidently had a relationship through—to the valley as well.

And that he himself in his years growing up and through the course, I think he said of 37 years, had lived in the valley for periods of time—extended periods of time and had taken responsibility for caring of land and caring of the natural resources and restoring the natural resources and the cultural sites in the valley.

Based on her expertise and her interview with Pratt, Dr. McGregor's opinion regarding Pratt's daytime activities was that "Pratt is engaging in traditional and customary native Hawaiian customs and practices related to subsistence and cultural religious purposes." Dr. McGregor was also asked:

Q. Have you been able to form an opinion as to whether or not his actual living in the valley at times and over extended times is similarly a legitimate exercise of this traditional and cultural native Hawaiian practices ?

A. Yes.

Q. And what is your opinion?

A. I think temporary residence for extended time is a traditional customary

---

9. In her testimony, Dr. McGregor did not specifically enumerate her fifth element, but discussed that, in her opinion, a traditional and customary Hawaiian practice cannot be a commercial enterprise, between what she identified as the fourth and sixth part of her test.

practice. It's linked to the—the responsibilities—well, I'd say it's necessary to fulfill the responsibilities of caring for the land and caring for the cultural sites and religious sites.

Dr. McGregor also testified that, in her view, native Hawaiians should be allowed to reopen and rededicate sites for use:

[Q.] [W]ould you agree that if somebody is going to clear and maintain a heiau that they ought to understand that it needs to be done in a way that's protective of the heiau, that they have some training, whether it's archeologically or otherwise, so that they know what they're doing? They're not taking a bunch of rocks and moving 'em around and digging up plants.

[A.] Yeah, I have experience with this in the island of Kahoolawe, for example, where we have rededicated sites. We've cleared sites to stabilize them and then reconstructed them and we've run into problems sometimes with the archeologists for doing that because we were attempting to bring these sites back to life and not just have them sit there as idle artifacts of history, but that they will again become a living part of our culture and practice.

So what we've worked out is if a site—a lot of the sites, and I believe the sites in Kalalau are documented, that it's important that they be documented, but then they should be allowed to be reopened and reused. And if that means building on them or reconfiguring some of the areas, I think what we've worked there is if the site has been documented then, you know, they can be reopened and rededicated for use and they shouldn't just have to be an idle artifact.

The District Court questioned Dr. McGregor about who gets to decide how a site gets fixed up and who decides who is a kahu. She replied:

Well, it should be in line with a practice and a training, of course, and a purpose. And so traditionally though you have instances where a heiau that is built in one generation is built over by the next generation and the use has been rededicated as well.

The famous example is that at Pu'ukohola' Halau heiau on Kawaihae where the original heiau was not a luakini or a sacrificial heiau and King Kamehameha ordered, you know, the people under him to bring—carry rocks from Kohala to rebuild and build up the Pu'ukohola' Halau heiau, and then it was rededicated as a luakini heiau for—to empower him in his wars of conquest.

So—and there are other cases where heiau can be rededicated and rebuilt toward another purpose and that's why they are layers, and different layers have different interpretations and uses as has been discovered through the archeological research.

Ideally, you know, you have a consensus on who will be acknowledged as the kahu for a site and then you allow that person to set the tradition as to how it would be used. So there is an acknowledgment of the kahu and there have been different examples in different islands how that is—how that is managed.

. . . .

[Regarding who decides who is a kahu—] It's a matter of training by someone who has been trained, again, from generation to generation in a protocol, in a tradition and in a practice. And one undergoes a lengthy period of training and then one should go through a process of what they call uniki or graduation into the practice, and then one—until one goes through that uniki, one is just a hamana or student of that kahu and can not claim that right until that person's gone through the process of, you know, the uniki process, the process of taking on that responsibility, putting their life in the hands of that tradition and taking on that responsibility and offering themselves into that service.

Q. How do we determine who's done that and who says they've done that or done something like that but hasn't?

A. Well, you need to ask who was the person that trained them and then you'd have to discuss, you know—if they are alive, you need to talk with them and other people in the community would know who they are and would verify that they were

persons who they knew to be trained in the practice and in tradition.

The District Court also asked Dr. McGregor for her views on how to balance the rights of a native Hawaiian practitioner "who wants to go to this place and dig and plant and cut and live and fish and reside, and then you have the State that has an interest in protecting this area to have it be a certain way, to have it be open to the public in a certain way." She replied: "[I]n the cases I'm familiar with, there's usually an effort made to work through a management plan that can allow for the traditional customary uses and practices that usually actually enhance the cultural and natural resources, and then would allow also for public access in a safe manner and a meaningful manner." Dr. McGregor referenced various curatorship and stewardship programs for other heiaus where the State has allowed native Hawaiians to take responsibility to care for the site.

#### d. *Wayne Souza's Testimony*

Wayne Souza (**Souza**), the Parks District Superintendent for Kaua'i, for the Department of Land and Natural Resources (**DLNR**), testified for the State. Souza testified that the purpose of the regulations involving closed areas and/or visiting hours at state parks is to protect State property and park resources, and to protect the safety and welfare of the public. With respect to Kalalau Valley, Souza testified that the State's number one concern is sewage because the self-composting toilets in the valley can handle only a limited number of people and, when that number is exceeded, they have experienced failures.

In addition, Souza testified that Kalalau Valley was part of a State wilderness park, that it is rich in cultural resources, native plant communities, native sea birds, and historic sites. Souza stated that most of the work on Kalalau's historic sites is on protection and stabilization of those sites and that the public can volunteer to work on a day-to-day basis or through a curatorship which deals with the cultural and archeological resources. Through the curatorship program, it is possible for a person to make an application to restore a heiau in a park. However,

any work would have to be approved and monitored by the DLNR. Souza did not know what criteria was used to resolve any conflicts that might arise between the regulation of the parks and the exercise of native Hawaiian rights.

### C. *The Ruling on the Motion to Dismiss*

After post-hearing briefing, on March 10, 2006, the District Court issued a Decision & Order on Defendant's Motion to Dismiss. Based on the evidence presented, in its written order, the District Court stated its essential findings as follows:

> It is undisputed, based on the testimony elicited at the November 4 hearing and concessions made by the State in its brief, that Mr. Pratt is [1] a native Hawaiian, [2] that he carried out customary or traditional native Hawaiian practices in Kalalau, and [3] that this exercise of rights occurred on undeveloped or less than fully developed land.
>
> . . . .
>
> The facts show that Mr. Pratt and his wife long ago set up what he calls a "residence" in the Kalalau Valley. The testimony of Mr. Pratt and photos entered into evidence show the extent of his activity in the valley, which includes clearing large areas (some of this clearing is at ancient heiau sites), planting food gardens, planting bananas, taro and coco palms, constructing an abode, utilizing a garden hose for watering. All of this in a State Wilderness area.
>
> Mr. Souza testified that keeping control of how many people access this wilderness area via regulations is necessary to protect this area for the public, conserve park resources, and to provide for the health and safety of those visiting the Park. He further stated that the number one concern relating to camping in the Park is sewage. Resources are limited in dealing with sewage, which is another reason the State needs to regulate the amount of campers in the Park.
>
> . . . .
>
> Mr. Pratt could, like everyone else, get a permit to go camping in the Park. He

340

could conduct religious ceremonies while in the valley via a permit. Mr. Pratt could also apply for the curatorship program that the State offers, (a program that was conveyed to him at an earlier trial on the same charges held in the Hanalei District, where Mr. Souza also testified). This curatorship program would allow him, if he was accepted, the opportunity to spend large amounts of time in the Valley, but under the direction and control of the State to insure that any clearing was done properly and in proper sites, that unwanted plant species would not be introduced in the Park, that he camped at a site with minimal intrusion to the enjoyment of others in the Park, that the issue of his sewage would be dealt with in a safe and healthy manner, and that restoration work would be properly carried out.

The Court finds that the State has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship.

The District Court rejected Pratt's view that, having demonstrated that he was a native Hawaiian and that he carried out customary or traditional native practices on undeveloped land, the inquiry should go no further and the charges against him should be dismissed. Instead, the District Court took the view that, under applicable Hawai'i law, "even with such a showing, the Court must reconcile competing interests and only uphold such rights and privileges reasonably exercised, to the extent feasible, and subject to the right of the State to regulate such rights." (Citations and internal quotation marks omitted; punctuation altered.) The District Court concluded that, notwithstanding Pratt's cognizable native Hawaiian rights, the exercise of such rights by setting up a residence and "church" in Kalalau Valley was not a reasonable exercise of such rights—in light of the State's interests in keeping Kalalau Valley a wilderness area, in protecting the health and safety of visitors to the valley, and in protecting and preserving this valuable asset—and the alternative ways that Pratt could exercise his native Hawaiian

rights. On this basis, which the District Court framed as a balancing of interests, Pratt's motion to dismiss was denied.

### D. *The Stipulated Facts and Testimony; Trial*

After the District Court denied Pratt's motion to dismiss, in anticipation of trial, Pratt and the State stipulated that: (1) Pratt was camping in the State park on the dates stated in the citations; (2) at each of these times, Pratt was camping in a closed area; (3) signs were posted stating that the locations where Pratt was camping was a closed area; (4) immediately prior to each incident, Pratt both saw the signs and had actual knowledge that he was camping in a closed area; and (5) the park was in the County of Kaua'i. The parties further stipulated that the November 4, 2005 testimony, as reflected in the transcript, would be deemed to have been given at trial, that any objections and rulings would be deemed to have been made at trial, and the stipulation would not constitute a waiver of any of the objections or claims that either party might choose to assert.

At the April 12, 2006 trial, the parties relied on the Stipulated Facts and Testimony, offering no additional evidence or witnesses. Pratt was convicted of three violations of HAR § 13–146–4 and sentenced to twenty hours of community service for each violation, with the sentence stayed pending this appeal.

### E. *The District Court's Findings and Conclusions*

After Pratt's trial and sentencing, Findings of Fact & Conclusions of Law were entered on May 15, 2006. The Findings of Fact incorporated by reference and expanded upon the facts stated in the District Court's earlier decision on the motion to dismiss, as well as made additional findings supporting the convictions. The unchallenged findings include, *inter alia* :

19. While camping in the Kalalau State Park, Lloyd Pratt did the following:
   a. set up residence,
   b. cleared large areas including ancient heiau sites,

c. planted food gardens which included bananas, taro and coco palms using a garden hose for watering.

The District Court's Conclusions of Law also incorporated by reference and expanded upon the legal conclusions stated in the District Court's earlier decision on the motion to dismiss, as well as made additional conclusions. Of relevance to the issues on this appeal are the following Conclusions of Law:

8. The defendant satisfied all three prongs of the affirmative defense as set forth in *State v. Hanapi.*

9. Case and statutory law all suggest that even with such a showing (under Hanapi), the Court must 'reconcile competing interests,' or stated another way 'accommodate competing ... interests' and only uphold such rights and privileges 'reasonably exercised' and 'to the extent feasible' and 'subject to the right of the State to regulate such rights.' See Article XII, section 7, Hawaii Constitution; *Public Access Shoreline Hawai'i v. Hawaii County Planning Commission,* 79 Hawai'i 425 [903 P.2d 1246] (1995).

10. The Court must balance the competing interests of Mr. Pratt's attempts to exercise certain native Hawaiian rights by setting up a residence and 'church' in the Kalalau Valley with the State's interest in keeping this a wilderness area for all to enjoy and be safe in.

11. The Court finds that the State has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship. This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

. . .

13. Pratt did not establish that his conduct was protected by the Federal Religious Freedom Restoration Act.

14. The Court finds that although the 'balancing test' is not directly discussed in *Hanapi,* it is implicit in that decision and can be found in analogous cases (including P.A.S.H.), and therefore, Pratt's conviction is not based on the application of an ex-post facto law as discussed in *Collins v. Youngblood,* 497 U.S. 37, 52 [110 S.Ct. 2715, 111 L.Ed.2d 30] (1990) and other cases cited by Pratt.

15. The Court finds that although the 'balancing test' is not directly discussed in *Hanapi,* it is implicit in that decision and can be found in analogous cases, and therefore, Pratt's conviction does not violate the rule of lenity as discussed in *State v. Smith,* 81 P.3d 408, 415 n. 6, 103 Hawai'i 228, 235 (Haw.2003), *State v. Young,* [107 Hawai'i 36] 109 P.3d 677, 680 (Haw.2005) and other cases cited on the record by Pratt.

16. The Court finds that although the 'balancing test' is not directly discussed in *Hanapi,* it is implicit in that decision and can be found in analogous cases, and therefore, Pratt's conviction does not violate stare decisis as argued by Pratt.

## II. *Points of Error on Appeal*

Pratt raises six points of error, arguing that:

1. The District Court erred when it weighed Pratt's right to exercise his native Hawaiian rights against the State's interests;

2. The District Court erred when it ruled that the balance of interests weighed in favor of the State;

3. Pratt's activities were protected under the Federal Religious Freedom Restoration Act;

4. Pratt's convictions violated the Ex Post Facto Clauses in the United States and Hawai'i Constitutions;

5. The Rule of Lenity should have been applied in this case; and

6. The District Court erred when it violated the principle of *stare decisis* in its interpretation of Hawai'i law.

## III. *Applicable Legal Standards*

On appeal, Pratt correctly articulates that conclusions of law, as well as questions of constitutional law and statutory law, are reviewed *de novo,* and that questions of fact

are reviewed under the clearly erroneous standard. *See, e.g., State v. Hanapi,* 89 Hawai'i 177, 182, 970 P.2d 485, 490 (1998); *State v. Walker,* 106 Hawai'i 1, 9, 100 P.3d 595, 603 (2004). Standards of review and burdens of proof are not just abstractions that must be listed in order to satisfy the requirements of appellate court rules. They provide the context in which cases must be decided.

In *Hanapi,* the supreme court clearly held that "the assertion of a constitutionally protected right presents a purely legal issue that must be determined by the court." *Hanapi,* 89 Hawai'i at 183, 970 P.2d at 491. In this case, we must "exercis[e] our own independent constitutional judgment based on the facts of the case." *Id.* at 182, 970 P.2d at 490 (citations omitted). Thus, in order to answer Pratt's question of whether the District Court improperly rejected his claim of constitutional privilege, this court must independently review Pratt's assertion that his conduct in violation of HAR § 13–146–4 constituted an exercise of his constitutionally protected native Hawaiian rights under the right/wrong standard.

In doing so, this court must also consider that Pratt, not the State, had the burden of proving that his activities were constitutionally privileged. *Hanapi,* 89 Hawai'i at 183, 970 P.2d at 491 ("When a criminal defendant claims to have been engaged in a constitutionally protected activity, the burden is placed on him or her to show that his or her conduct fell within the prophylactic scope of the constitution's provision.") (citation omitted).

Pratt does not challenge any of the District Court's factual findings. Nor does Pratt assert that the court erroneously failed to make adequate findings or omitted any findings that were essential to his claim of constitutional privilege.

## IV.  *The Protections Afforded to Native Hawaiian Rights*

In 1978, the Hawai'i Constitution was amended to constitutionally mandate the State's recognition and protection of customary and traditional native Hawaiian rights. Article XII, § 7 of the Hawai'i Constitution (1978) provides:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Although these rights were constitutionally recognized in 1978, as discussed in the Hawai'i Supreme Court cases that followed, the statutory protections for customary and traditional native Hawaiian access, water, and gathering rights go back to the mid–1800s.

### A.  *Kalipi*

In 1982, in a landmark opinion written by Chief Justice William S. Richardson, the Hawai'i Supreme Court made clear that the constitutional mandate to preserve and enforce traditional rights necessitates a balancing of respective interests and harms, once it has been established that the asserted customary right exists in a particular area and accrues to the person who is claiming it. *See Kalipi v. Hawaiian Trust Co., Ltd.,* 66 Haw. 1, 656 P.2d 745 (1982). In *Kalipi,* the supreme court also explained the historic foundation of the statutory protections afforded to such rights. Many aspects of *Kalipi* inform us regarding the issues before us in this case.

William Kalipi (**Kalipi**) lived on Moloka'i in the ahupua'a of Keawenui and claimed the right to enter certain undeveloped lands in the nearby ahupua'a of Ohia and Manawai. *Id.* at 3, 656 P.2d at 747. Kalipi owned a taro patch in Manawai and an adjoining houselot in East Ohia, but did not live there. *Id.* Kalipi asserted that it had long been the practice of his family to gather indigenous agricultural products, including ti leaf, bamboo, kukui nuts, kiawe, medicinal herbs, and ferns, from the defendants' land. *Id.* at 3–4, 656 P.2d at 747.

Kalipi suggested three sources for his gathering rights:

> The first is HRS § 7–1, a statute of ancient origin initially passed when the concept of private ownership of real property had first been introduced into these

islands. The second is native custom and tradition, a source of the law which he claims to have been fixed in 1892 by the passage of what is now HRS § 1–1. And the third is the reservation found in all relevant documents of original title in this case, language reserving the people's "kuleana" in lands converted to fee simple ownership when such conversion first occurred.

*Id.* at 4, 656 P.2d at 747.

The supreme court rejected the defendants' argument that traditional gathering rights should not be enforced as a matter of policy because doing so would conflict with the exclusivity principles associated with fee simple ownership of land. Instead, the court turned to the constitutional reaffirmation of customarily and traditionally exercised native Hawaiian rights. *Id.* at 4–5, 656 P.2d at 748.

The *Kalipi* court then examined HRS § 7–1,[10] a statute first passed in 1850, amended in 1851, and continued in Hawai'i law from that time to the present without substantial modification. *Id.* at 5, 656 P.2d at 748. Analytically dividing the statute into specifically limited and enumerated gathering rights, and more generally-framed access and water rights, the supreme court focused, as a matter of first impression, on the interpretation of the gathering rights. *Id.* at 5–6, 656 P.2d at 748. The court examined the historical and cultural significance of the ahupua'a system to the Hawaiian people prior to the Great Mahele of 1848, which replaced the ancient feudal system of land tenure with a system of fee simple land ownership. *Id.* at

6–7, 656 P.2d at 748–49.[11] The Great Mahele primarily addressed the division of Kingdom lands between the chiefs and the King. The Kuleana Act of 1850, the last section of which is the predecessor to HRS § 7–1, provided a way for ahupua'a tenants to receive fee simple title to the lands which they had cultivated and improved. Recognizing that the kuleana lands would be of little value without water, access, and gathering rights, the language which is now set forth in HRS § 7–1 was included. *Kalipi*, 66 Haw. at 7, 656 P.2d at 749 (citing Privy Council Minutes, July 13, 1850).

In *Kalipi*, the supreme court sought to strike a balance between the protection of traditional rights and the exclusivity rights associated with fee simple land ownership "by interpreting the gathering rights of § 7–1 to assure that lawful occupants of an ahupuaa may, for the purposes of practicing native Hawaiian customs and traditions, enter undeveloped lands within the ahupuaa to gather those items enumerated in the statute[,] … subject to further governmental regulation." 66 Haw. at 7–8, 656 P.2d at 749 (footnote omitted). The court noted:

> These rights are rights of access and collection. They do not include any inherent interest in the natural objects themselves until they are reduced to the gatherer's possession. As such those asserting the rights cannot prevent the diminution or destruction of those things they seek. The rights therefore do not prevent owners from developing lands.

*Id.* at 8 n. 2, 656 P.2d at 749 n. 2.[12]

---

10. HRS § 7–1 (2009) provides:
§ 7–1 **Building materials, water, etc.; landlords' titles subject to tenants' use.** Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided that this shall not be applicable to wells and watercourses, which individuals have made for their own use.

11. As discussed in *Kalipi* and earlier cases, in ancient Hawai'i, the ahupua'a was a division of land that usually ran from the sea to the mountains, allowing a chief and his people access to the resources of both, as well as all lands in between. The ahupua'a tenants were allowed to cultivate land in exchange for services to their chief or the King, and all benefitted from the shared access to undeveloped lands so that the items naturally found there could be used for subsistence and cultural purposes. *Kalipi*, 66 Haw. at 6–7, 656 P.2d at 748–49 (citing *Palama v. Sheehan*, 50 Haw. 298, 440 P.2d 95 (1968) and *In re Boundries of Pulehunui*, 4 Haw. 238 (1879)).

The *Kalipi* court explained that "lawful occupants" are persons residing within the ahupua'a, and that mere ownership of land is insufficient to trigger rights under HRS § 7–1. *Id.* at 8, 656 P.2d at 749–50. The court interpreted the statute to provide only for the gathering of the items enumerated therein. *Id.* Recognizing that further limitations were not contained within the express statutory language, the court nevertheless concluded that limiting the HRS § 7–1 rights to undeveloped land, and to existing native customs, was necessary to the aforementioned balance struck by the court. *Id.* at 8–9, 656 P.2d at 750. As Kalipi did not live in the ahupua'a in which he sought to exercise gathering rights under HRS § 7–1, as a matter of law, he was not entitled to such privileges. *Id.* at 9, 656 P.2d at 750.

The supreme court next considered Kalipi's claim to gathering rights under the "Hawaiian usage" exception to the adoption of English common law pursuant to HRS § 1–1.[13] *Id.* at 9–12, 656 P.2d at 750–52. Kalipi contended that the reference to Hawaiian usage in HRS § 1–1 establishes certain customary Hawaiian rights, including gathering rights not identified in HRS § 7–1. *Id.* at 9, 656 P.2d at 750. The supreme court opined that, where practices associated with the ancient way of life require utilization of the undeveloped lands of others, and have been continued to be exercised, the continuation of those practices is protected under HRS § 1–1, so long as no actual harm is done thereby. *Id.* at 10–12, 656 P.2d at 751–52.

The *Kalipi* court did not address the "precise nature and scope" of the rights retained by § 1–1, stating only that they would depend on the particular circumstances of each case. The court did not reach these issues in *Kalipi* because:

> [A]s with the gathering rights of § 7–1, there is an insufficient basis to find that such rights would, or should, accrue to persons who did not actually reside within the ahupuaa in which such rights are claimed. [Kalipi] therefore would have no gathering rights on the property in question pursuant to HRS § 1–1.

*Id.* at 12, 656 P.2d at 752.

Finally, the *Kalipi* court touched only briefly on Kalipi's argument that his alleged gathering rights were reserved in the original land awards for Manawai and eastern Ohia. *Id.* The supreme court concluded that any traditional rights preserved in such grants or awards accrue only to the benefit of persons who live within the ahupua'a in which such rights are sought to be asserted. *Id.* Accordingly, Kalipi was without such rights. *Id.*

### B. *Pele Defense Fund v. Paty*

In 1992, the Hawai'i Supreme Court again examined issues concerning native Hawaiian access rights in *Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247 (1992). Pele Defense Fund (**PDF**) brought suit on behalf of its native Hawaiian members arguing, *inter alia*, that article XII, § 7 was violated by the continued denial of access into Wao Kele 'O Puna, on the Island of Hawai'i (**Big Island**), to its native Hawaiian members who sought access for customarily and traditionally exercised subsistence, cultural, and religious practices. *Id.* at 613, 837 P.2d at 1268. The supreme court declined to disturb the

---

12. Although not at issue in this case, we note that the supreme court later contemplated potential limits on a property owner's right to develop its land, if necessary to prevent the elimination of an ahupua'a tenant's established rights. *See Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n*, 79 Hawai'i 425, 451, 903 P.2d 1246, 1272 (1995) (**PASH**) ("Although access [for the exercise of legitimate customary and traditional practices] is only *guaranteed* in connection with undeveloped lands, and article XII, section 7 does not *require* the preservation of such lands, the State does not have the unfettered discretion to regulate the rights of ahupua'a tenants out of existence.").

13. HRS § 1–1 (2009) provides:

> **§ 1–1. Common law of the State; exceptions.** The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.

unchallenged finding of the trial court that PDF's members included persons who were of fifty percent or more Hawaiian blood who lived in certain ahupua'a abutting, but not in, Wao Kele 'O Puna. *Id.* at 615 n. 28, 837 P.2d at 1269 n. 28.

PDF claimed that, although its members did not live in Wao Kele 'O Puna, they should be allowed access to engage in customarily and traditionally exercised practices because Wao Kele 'O Puna "historically served as a common gathering area which could be utilized by tenants who resided in ahupua'a abutting Wao Kele 'O Puna." *Id.* at 616, 837 P.2d at 1269. The supreme court analyzed the similarities and differences between the PDF members and Kalipi, noting first that both asserted native Hawaiian rights based on article XII, § 7, and HRS § 1-1 in an ahupua'a other than the ones in which they resided. *Id.* at 618, 837 P.2d at 1271. The court noted, however, that the PDF members claimed that their rights were based on traditional access and gathering patterns of native Hawaiians in the Puna region and that *Kalipi* foresaw that the scope of rights retained under HRS § 1-1 would depend on the particular circumstances of a case. *Id.* at 618–19, 837 P.2d at 1271.

The supreme court reaffirmed the holding in *Kalipi*, stating:

> [W]e upheld the rights of native Hawaiians to enter undeveloped lands owned by others to practice continuously exercised access and gathering rights necessary for subsistence, cultural or religious purposes so long as no actual harm was done by the practice. As found by the *Kalipi* court, and reported by the Constitutional Convention committee that drafted article XII, § 7, these rights are associated with residency within a particular ahupua'a. *See* Stand. Comm. Rep. No. 57, reprinted in 1 *Proceedings of the Constitutional Convention of Hawaii of 1978*, 637.
>
> The Committee on Hawaiian Affairs added what is now article XII, § 7 to reaffirm customarily and traditionally exercised rights of native Hawaiians, while giving the State the power to regulate these rights. Although these rights were primarily associated with tenancy within a particular ahupua'a, the committee report explicitly states that the new section reaffirms all rights customarily and traditionally held by ancient Hawaiians. The committee contemplated that some traditional rights might extend beyond the ahupua'a; for instance, it was customary for a Hawaiian to use trails outside the ahupua'a in which he lived to get to another part of the Island. The committee intended this provision to protect the broadest possible spectrum of native rights[.]

*Id.* at 619, 837 P.2d at 1271 (citations, internal quotation marks, brackets, and footnote omitted).

The supreme court held that if "the customary and traditional rights associated with tenancy in an ahupua'a extended beyond the boundaries of the ahupua'a, then article XII, § 7 protects those rights as well. . . . [N]ative Hawaiian rights protected by article XII, § 7 may extend beyond the ahupua'a in which a native Hawaiian resides where such rights have been customarily and traditionally exercised in this manner." *Id.* at 620, 837 P.2d at 1272.

In the trial court, PDF had presented affidavit evidence that supported the claim that, from the time of the Great Mahele and the Kuleana Acts, the access and gathering patterns of tenants in the Puna region did not conform to the usual notion that tenants exercise their rights only within the boundaries of a given ahupua'a. *Id.* at 620–21, 837 P.2d at 1272. Rather, affiants testified that the Puna Forest Reserve area was accessed for gathering and hunting by tenants from several ahupua'a. *Id.* On this basis, the supreme court vacated the summary judgment order of the trial court. *Id.* at 621, 837 P.2d at 1272. The case was remanded for a trial on merits to allow PDF to develop the facts and present evidence to support its claim that Wao Kele 'O Puna was a traditional gathering place utilized by the tenants of the abutting ahupua'a, and that the other requirements of *Kalipi* were met. *Id.*

## C.  *PASH*

In 1995, the Hawai'i Supreme Court further examined native Hawaiian rights under Hawai'i law, particularly those rights stem-

ming from continued traditional customs and usage. *See Public Access Shoreline Hawaii v. Hawaii County Planning Comm'n,* 79 Hawai'i 425, 903 P.2d 1246 (1995) (*PASH*). PASH was an unincorporated membership-based advocacy organization that was opposed to a proposed resort development on land within a Special Management Area (**SMA**) on the Big Island. *Id.* at 429, 903 P.2d at 1250. When developer Nansay Hawai'i, Inc. (**Nansay**) applied to the Hawai'i County Planning Commission (**HPC**) for an SMA use permit, PASH opposed the issuance of the permit and requested a contested case hearing. *Id.* HPC determined that, under the applicable rules, PASH did not have standing to request a contested case hearing because PASH's interests were not clearly distinguishable from those of the general public. *Id.* The supreme court disagreed with HPC, making clear that a native Hawaiian who has "exercised such rights as were customarily and traditionally exercised for subsistence, cultural, and religious purposes on undeveloped lands" of an ahupua'a has an interest that is clearly distinguishable from that of the general public. *Id.* at 434, 903 P.2d at 1255 (internal quotation marks omitted), quoting with approval, *Public Access Shoreline Hawaii v. Hawaii County Planning Comm'n,* 79 Hawai'i 246, 900 P.2d 1313 (App.1993) (*PASH I*).[14]

The supreme court then turned to the substantive issues in *PASH* including, *inter alia,* HPC's obligations under article XII, § 7 of the Hawai'i Constitution and HRS § 1–1 to protect customary and traditional Hawaiian rights, "clarify[ing] the status of customary rights in general," and providing some guidelines for HPC's further determinations "in the event that Nansay elect[ed] to pursue its challenges to the legitimacy of PASH's claims." 79 Hawai'i at 437–38, 903 P.2d at 1258–59.

The *PASH* court reviewed *Kalipi*'s recognition of traditional gathering rights based upon residency in a particular ahupua'a. Then, because Kalipi had rested his claim in part based on ownership of a parcel of land, the *PASH* court discussed the distinction between a claim based on practiced ancient Hawaiian customs versus a claim based on land ownership in an ahupua'a. *Id.* at 439–40, 903 P.2d at 1260–61. The issue in *PDF v. Paty* (relevant to this discussion) had been whether native Hawaiian residents of an ahupua'a who customarily and traditionally exercised access and gathering rights in a nearby ahupua'a were entitled to protection under article XII and HRS § 7–1; thus, like *Kalipi, PDF v. Paty* left open questions regarding the nature and scope of other rights retained by HRS § 1–1. *Id.* The *PASH* court, however, weighed in on the Hawaiian usage rights in HRS § 1–1, which had been recognized but not applied in *Kalipi:*

> In [*Kalipi,*] witnesses testified at trial that there have continued in certain ahupua'a a range of practices associated with the ancient way of life which required the utilization of the undeveloped property of others and which were not found in § 7–1. Where these practices have, without harm to anyone, been continued, we are of the opinion that the reference to Hawaiian usage in § 1–1 insures their continuance for so long as no actual harm is done thereby.

*Id.* at 440, 903 P.2d at 1261 (citations, brackets and footnote omitted).

Through this quoted passage, and elsewhere throughout the decision, the *PASH* court made clear that ancient Hawaiian customs and usage, that have been continued in practice on the undeveloped land of others, would be protected under Hawai'i law, so long as no actual harm is done thereby, notwithstanding clashes with other property rights. *Id.* The *PASH* court reaffirmed that "the retention of a Hawaiian tradition

---

**14.** Although concluding that PASH had sufficiently demonstrated that it had standing sufficient to participate in a contested case, the supreme court emphasized that, upon remand to HPC, opportunities would necessarily be afforded all parties to present evidence and argument on "all issues involved" in the contested case, including whether the rights alleged were established customary usages entitled to protection. *PASH,* 79 Hawai'i at 434–35 & 447–48, incl. n. 39, 903 P.2d at 1255–56 & 1268–69, incl. n. 39. The standing issue was also discussed in the context of Nansay's argument that the circuit court lacked appellate jurisdiction under HRS § 91–14. *Id.* at 431–34, 903 P.2d at 1252–55.

should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." *Id.* Under *PASH*, this balancing clearly tips in favor of the protection of the *reasonable* exercise of continued, traditional, ancient Hawaiian usage and practices, but tips against *non-traditional* practices and even valid customary rights, if they are practiced in an unreasonable manner. *Id.* at 442, 903 P.2d at 1263; *See also id.* at 447, 903 P.2d at 1268 ("[W]e reiterate that the State retains the ability to reconcile competing interests under article XII, section 7. We stress that unreasonable or non-traditional uses are not permitted under today's ruling.").

*PASH* also identified some of the other factors relevant to the analysis of practices that are asserted to be protected as customary Hawaiian rights under HRS § 1–1.[15] *PASH* reaffirmed earlier case law fixing November 25, 1892 as the date by which Hawaiian usage must have been established in practice to fall within the protection of Hawai'i law. *Id.* at 447, 903 P.2d at 1268.[16] *PASH* clarified that the fifty percent blood quantum requirement found in the Hawaiian Homes Commission Act is not applicable to the customary and traditional rights protected under article XII, § 7 and HRS §§ 1–1 and 7–1. *Id.* at 449, 903 P.2d at 1270. Although explaining that persons who *are* descendants of native Hawaiians who inhabited the island prior to 1778—and who assert valid rights protected under HRS § 1–1—are entitled to protection regardless of blood quantum, *PASH* did not decide whether other persons might also be entitled to assert customary and traditional rights under the "ancient Hawaiian usage" exception in HRS § 1–1. *Id.* at 448–49, including n. 40 & n. 41,

903 P.2d at 1269–70, including n. 40 & n. 41. *PASH* also instructed that ancient Hawaiian usage must be based on an actual traditional practice that has been continued, and not based on assumption or conjecture, and the right of each ahupua'a tenant to continue to exercise such traditional and customary practices "remains intact, notwithstanding arguable abandonment of a particular site, although this right is potentially subject to regulation in the public interest." *Id.* at 449–50, 903 P.2d at 1270–71. Finally, *PASH* emphasized that the State is authorized to impose appropriate regulations to govern the exercise of native Hawaiian rights, but that, to the extent feasible, the State must protect the reasonable exercise of customary or traditional rights that are established by the person asserting such rights. *Id.* at 450–51, 903 P.2d at 1271–72.

### D.  *Hanapi*

While *Kalipi, PDF v. Paty*, and *PASH* analyzed the scope of constitutionally protected native Hawaiian rights in the context of private property rights, *Hanapi* examined whether conduct that is claimed to be the reasonable exercise of constitutionally protected native Hawaiian rights might qualify as a privilege for the purposes of enforcing criminal trespass statutes. *See State v. Hanapi*, 89 Hawai'i 177, 970 P.2d 485 (1998). Alapai Hanapi (**Hanapi**) was a native Hawaiian man, living on Moloka'i, who was arrested and convicted of the offense of criminal trespass in the second degree. On appeal, Hanapi argued, *inter alia*, that his conviction should be reversed because the prosecution failed to negate his claim that his conduct was an exercise of his constitutionally protected native Hawaiian rights. *Id.* at 178, 970 P.2d at 486.

15. *PASH* also includes an informative discussion of the development of private land ownership in Hawai'i. 79 Hawai'i at 442–47, 903 P.2d at 1263–68. Pratt, however, sought to engage in alleged Hawaiian customs and usage on public lands, not private property.

16. The court explained, however, for the purposes of establishing standing to seek a contested case in the first instance, PASH's failure to establish that the asserted customs existed prior to the

1920's would not be a barrier, but would be a possible issue that could be explored on remand. *PASH* 79 Hawai'i at 447–48 n. 39, 903 P.2d at 1268–69 n. 39. Although arguably repeating earlier conclusions, *PASH* also reaffirmed that "article XII, section 7, which, inter alia, obligates the State to protect customary and traditional rights normally associated with tenancy in an ahupua'a, may also apply to the exercise of rights beyond the physical boundaries of that particular ahupua'a." *Id.* at 448, 903 P.2d at 1269.

The supreme court rejected the parties' characterization of Hanapi's claim as being a penal defense to the trespass charge. *Id.* at 182, 970 P.2d at 490. When a penal defense is raised, after the defendant establishes his or her *prima facie* defense, by coming forward with some credible evidence of facts constituting the defense, the burden shifts to the prosecution to disprove the defense beyond a reasonable doubt. *Id.* Hanapi's assertion of a constitutionally protected right, however, presented a purely legal issue for determination by the court. *Id.* at 183, 970 P.2d at 491. Thus, the burden was placed on Hanapi to demonstrate that his conduct fell within the scope of the constitutional protection. *Id.*

Citing two cases in which the United States Supreme Court held that the defendants therein had the burden to show that their conduct fell within the protections of the First Amendment, the Hawai'i Supreme Court held:

> As a practical matter, it would be unduly burdensome to require the prosecution to negative any and all native Hawaiian rights claims regardless of how implausible the claimed right may be. To hold otherwise would be to create a rule that all conduct is presumptively protected under the Constitution. We therefore hold that it is the obligation of the person claiming the exercise of a native Hawaiian right to demonstrate that the right is protected.

*Id.* at 184, 970 P.2d at 492 (citations, brackets, and quotation marks omitted). The supreme court expressed a preference that an assertion of a constitutional right be made by way of a motion to dismiss, but noted that such a motion to dismiss could be consolidated with a bench trial, so long as the trial judge makes separate findings of fact and conclusions of law on the constitutional issues. *Id.* at 184, 970 P.2d at 492.

After squarely placing the burden on Hanapi to prove that his conduct was entitled to constitutional protection, and addressing Hanapi's evidentiary points of error, the supreme court identified three factors which, "at a minimum," must be shown to establish an affirmative defense that particular conduct is constitutionally protected as a native Hawaiian right. *Id.* at 186, 970 P.2d at 494. First, a defendant must qualify as a "native Hawaiian" within the guidelines set out in *PASH. Id.* Second, a defendant must establish that his or her claimed right is constitutionally protected as a customary or traditional native Hawaiian practice as codified—but not necessarily enumerated—in article XII, § 7 of the Hawai'i Constitution, HRS § 1–1 and/or HRS § 7–1. *Id.* at 186, 970 P.2d at 494. Third, a defendant must prove that the exercise of the right occurred on undeveloped or less than fully developed property. *Id.* at 186–87, 970 P.2d at 494–95.[17] Although not identified as one of the three factors, the court also repeated *PASH*'s qualification that constitutionally protected native Hawaiian rights must be *reasonably* exercised. *Id.* at 184–85, 970 P.2d at 492–93.

It was uncontroverted that Hanapi was a native Hawaiian. The disputed issue was whether Hanapi had proved that his conduct constituted the exercise of a constitutionally protected customary or traditional native Hawaiian right.[18] Emphasizing that Hawaiian usage must be based on actual ancient Hawaiian practice and not based on assumptions or conjecture, the supreme court reviewed Hanapi's evidence as follows:

> At trial, Hanapi adduced no evidence establishing 'stewardship' or 'restoration and healing of lands' as an ancient traditional or customary native Hawaiian practice. Instead, Hanapi reiterated his responsibility and sense of obligation to the land, as a native Hawaiian tenant, to justify his privileged access to [his neighbor's]

---

17. The supreme court reserved specific questions regarding the status of native Hawaiian rights on property that is less than fully developed. To clarify *PASH*, however, the *Hanapi* court specifically held that customary and traditional native Hawaiian rights cannot be exercised on "lands zoned and used for residential purposes with existing dwellings, improvements, and infrastruc-

ture." 89 Hawai'i at 186–87, 970 P.2d at 494–95.

18. The court did not reach the issue of whether the property in question was undeveloped. *Hanapi*, 89 Hawai'i at 187 n. 11, 970 P.2d at 495 n. 11.

property. This evidence assumed, rather than established, the existence of a protected customary right.

To establish the existence of a traditional or customary native Hawaiian practice, we hold that there must be an adequate foundation in the record connecting the claimed right to a firmly rooted traditional or customary native Hawaiian practice. Here, Hanapi did not offer any explanation of the history or origin of the claimed right. Nor was there a description of the 'ceremonies' involved in the healing process. Without this foundation, the district court properly rejected, albeit inartfully, Hanapi's claim of constitutional privilege. *Id.* at 187, 970 P.2d at 495 (citations and footnote omitted).

In a footnote, the supreme court commented that the "adequate foundation" might come from expert testimony and that the court has "accepted kama'aina witness testimony as proof of ancient Hawaiian tradition, custom, and usage." *Id.* at 187 n. 12, 970 P.2d at 495 n. 12, citing *Palama v. Sheehan*, 50 Haw. 298, 440 P.2d 95 (1968); *Application of Ashford*, 50 Haw. 314, 316, 440 P.2d 76, 78 (1968); *In re Boundaries of Pulehunui*, 4 Haw. 239 (1879). The term "kama'aina witnesses" referred to persons who knew and had long lived in an area and, because they were specially taught or made repositories of knowledge about that area, were permitted to testify as to ancient tradition, custom, and usage regarding the location of boundaries to various divisions of land. *See, e.g., Ashford*, 50 Haw. at 316–17, 440 P.2d at 78–79; *see also The Nature Conservancy v. Nakila*, 4 Haw.App. 584, 595–96, 671 P.2d 1025, 1033–34 (1983) (kama'aina testimony is "reputation evidence" as to boundaries of or customs affecting land in a community, which is an exception to the hearsay rule under HRE 803(b)(20), but which requires the testimony to reflect a consensus of opinion).

The supreme court concluded, however, that Hanapi failed to adduce sufficient evidence to support his claim of constitutional privilege and there was sufficient evidence to conclude that Hanapi was unlawfully on his neighbor's property. Therefore, Hanapi's conviction was affirmed. 89 Hawai'i at 187–88, 970 P.2d at 495–96.

## V. Discussion of the Issues Raised On Pratt's Appeal

### A. The Native Hawaiian Rights Privilege Asserted

■ The analysis of Pratt's claim begins with the threshold criteria articulated in *Hanapi:* (1) the defendant must be a native Hawaiian, (2) whose claimed right is a constitutionally protected customary or traditional native Hawaiian practice, (3) which is conducted on undeveloped land. Contrary to Pratt's assertion, *Hanapi* held that, *at a minimum*, these three factors have to be met to prove that a defendant's conduct is entitled to constitutional protection. *Hanapi*, 89 Hawai'i at 185–86, 970 P.2d at 493–94. In order to review the "purely legal issue" of whether the District Court improperly rejected Pratt's claimed constitutional privilege, we must first examine whether Pratt met his burden on each of these factors. *Id.* at 182–83, 970 P.2d at 490–91 (holding that the existence of a constitutionally protected right is a question of law for the court's determination). Although the parties in effect agreed that the three *Hanapi* factors were met, the State's concession is not binding on us and does not relieve us from our obligation to "exercis[e] our own independent constitutional judgment based on the facts of the case." *Id.; see also Beclar Corp. v. Young*, 7 Haw.App. 183, 750 P.2d 934 (1988) (holding that the parties' agreement on a question of law was not binding on the court); *State v. Tangalin*, 66 Haw. 100, 101, 657 P.2d 1025, 1026 (1983) (noting, "it is well established that matters affecting the public interest cannot be made the subject of stipulation so as to control the court's action with respect thereto").[19]

19. While I understand my fellow judges' reluctance to address issues that were "undisputed, based on the testimony elicited at the hearing and the concessions made by the State in its brief," in addition to the above-referenced Hawai'i cases instructing us to exercise our independent judgment, the decisions of state and federal courts throughout the country support the conclusion that we should not rest our legal conclusions in this case on the State's conces-

Pratt presented credible evidence that he is a descendant of native Hawaiians who inhabited the islands prior to 1778 and, accordingly, that he is a "native Hawaiian" within the guidelines set out in *PASH*. Thus, the District Court properly concluded that the first prong of the *Hanapi* test is satisfied.

The second prong, whether Pratt's conduct is constitutionally protected, is more complicated. The District Court concluded, generally, that Pratt "carried out customary or traditional practices in Kalalau" based on the State's concessions regarding the *Hanapi* factors. We must examine the conclusion that Pratt's activities fall within the scope of

sions regarding the satisfaction of this important constitutional question. Justice Brandeis, writing for the United States Supreme Court, explained: "If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law." *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289–90, 37 S.Ct. 287, 61 L.Ed. 722 (1917); *see also Sanford's Estate v. Comm'r of Internal Revenue*, 308 U.S. 39, 50–51, 60 S.Ct. 51, 84 L.Ed. 20 (1939) (citing *Swift*); *United States v. Vega–Ortiz*, 425 F.3d 20, 22 (1st Cir.2005) (citation and internal quotation marks omitted) ("While concessions are often useful to a court, they do not, at least as to questions of law that are likely to affect a number of cases in the circuit beyond the one in which the concession is made, relieve this Court of the duty to make its own resolution of such issues."); *H & R Block E. Enters., Inc. v. Raskin*, 591 F.3d 718, 723 n. 10 (4th Cir.2010) (citations, brackets and internal quotation marks omitted) ("a court is not required to accept what in effect is a stipulation on a question of law"); *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir.2002) (holding that the district court erred when it accepted the stipulation that a police officer was acting under the color of law and considered only the second prong of § 1983 analysis because whether the officer was acting under color of law is a legal issue); *Saviano v. Comm'r of Internal Revenue*, 765 F.2d 643, 644 (7th Cir.1985) (while parties are free to stipulate to the factual elements of a transaction, the characterization of that transaction for tax purposes involves a legal conclusion to be reached by the court; parties may not stipulate to the legal conclusions to be reached by the court); *United States. v. Gomez–Leon*, 545 F.3d 777, 790 n. 10 (9th Cir.2008) (citation, internal quotation marks and brackets omitted) ("we are not bound by a party's concession as to the meaning of the law, even if that party is the government and even in the context of a criminal case"); *Koch v. United States*, 47 F.3d 1015, 1018 (10th Cir.1995) (citation, internal quotation marks and brackets omitted) ("While this court will honor stipulations regarding factual issues, it is well-settled that a court is not bound by stipulations of the parties as to questions of law."); *Weston v. Washington Metro. Area Trans. Auth.*, 78 F.3d 682, 685 (D.C.Cir.1996) (citations, internal quotation marks and brackets omitted) ("While parties may enter into stipulations of fact that are binding upon them unless they can show mani-

fest injustice, parties may not stipulate to the legal conclusions to be reached by the court."). State courts decisions in accord with this principle include: *McGinty v. Hoosier*, 239 P.3d 843, 853 (Kan.2010) (citation omitted) ("Parties are not permitted to define the law for the courts through agreements, admissions, or stipulations"; "litigants' agreement on legal questions ineffective to bind court"); *State v. Drum*, 168 Wash.2d 23, 225 P.3d 237, 242 (2010) (citations, internal quotation marks and brackets omitted) ("a stipulation as to an issue of law is not binding on this court; it is the province of this court to decide the issues of law"); *State v. Carter*, 327 Wis.2d 1, 785 N.W.2d 516, 526 (2010) (footnote and citation omitted) ("Although the parties agree about how [a statute] and the existing case law apply to the undisputed facts in the present case, we are not bound by the parties' interpretation of the law or obligated to accept a party's concession of law. This court, not the parties, decides questions of law."); *Beulah v. State*, 352 Ark. 472, 101 S.W.3d 802, 804 (2003) (citations and internal quotation marks omitted) ("agreement between parties does not convert an otherwise incognizable claim into a cognizable one"; "proper administration of the law cannot be left merely to the stipulation of the parties"); *Bar 70 Enters., Inc. v. Tosco Corp.*, 703 P.2d 1297, 1306 (Colo.1985) (en banc) (citation, internal quotation marks and footnote omitted) ("A stipulation cannot be used to bind a court in the determination of questions of law or mixed questions of law and fact. On the contrary, it always remains the independent responsibility of the court to decide the law applicable to a particular case and the legal sufficiency of the evidence in regard to a contested claim."); *Dresser Indus., Inc. v. Alaska Dept. of Labor*, 633 P.2d 998, 1004 including n. 11 (Alaska 1981) (parties may agree as to the facts, but cannot control any question of law to be determined under them; parties' concessions regarding interpretation of law are not binding upon the courts); *Leonard v. Los Angeles*, 31 Cal.App.3d 473, 107 Cal.Rptr. 378, 380 (1973) (citations omitted) ("it is generally held that a stipulation between the parties may not bind a court on questions of law, and this includes legal conclusions to be drawn from admitted or stipulated facts"); *Valdez v. Taylor Auto. Co.*, 129 Cal.App.2d 810, 278 P.2d 91, 97 (1955) ("a stipulation as to the legal effect of the facts [is] a conclusion of law. And as we shall see it was an erroneous conclusion from the facts and as such is not binding on this court.").

the constitutional protection. Although not all constitutionally protected activities are specifically enumerated in the Constitution or statutes, the analysis must begin there. This court cannot reach Pratt's question concerning whether the District Court improperly applied a balancing test between constitutionally protected rights and the State's interest absent agreement with the District Court's legal conclusion that Pratt's activities were entitled to constitutional protection.

## B.  *Analysis under HRS § 7–1*

As discussed above, the supreme court has held that HRS § 7–1 and article XII, § 7 of the Hawai'i Constitution assure that lawful occupants or tenants of an ahupua'a may, for the purpose of practicing continuously exercised native Hawaiian customs and traditions, enter undeveloped lands within the ahupua'a to gather the items enumerated in the statute, subject to regulation. *See Kalipi,* 66 Haw. at 10–12, 656 P.2d at 751–52; *see also* HRS § 7–1, set forth in n. 11 above. These rights are rights to water, access, and collection of various materials naturally found on the land for subsistence, cultural, and religious purposes.

■ Pratt's activities do not fall within the scope of HRS § 7–1. Like Kalipi, Pratt has not established that he is a lawful occupant or tenant of the ahupua'a of Kalalau. The District Court made *no factual findings* that Pratt or any of his family members lawfully resided, owned, or occupied land in Kalalau Valley. Pratt's testimony regarding his understanding that his paternal great grandmother's family line was in some way connected with a family named Kupihea, along with a reference that someone named Kupihea once owned a kuleana lot in Kalalau, is not sufficient evidence to establish his entitlement to the rights reserved to native Hawaiian ahupua'a residents under HRS § 7–1. HRS § 1–1 and article XII, § 7 of the Hawai'i Constitution preserve native Hawaiian rights beyond the boundaries of a particular ahupua'a, but HRS § 7–1 was enacted to ensure that kuleana tenants would have continued access to water, trails, and the natural resources of their ahupua'a. *PDF v. Paty* recognized that native Hawaiian rights may extend beyond an ahupua'a under HRS § 1–1 and article XII, § 7, but did not overrule *Kalipi's* interpretation of HRS § 7–1.

Pratt clearly cares for and feels a spiritual connection to Kalalau and the ancient Hawaiians that once occupied the valley. Pratt did not, however, meet his burden of establishing that he is entitled to access or gathering rights in Kalalau Valley pursuant to HRS § 7–1. Accordingly, with respect to HRS § 7–1, we need not reach the issue of whether the specific activities engaged in by Pratt at the time of his citation would be entitled to statutory and constitutional protections thereunder.[20]

## C.  *Analysis under HRS § 1–1*

A broader range of native Hawaiian rights is protected under HRS § 1–1 and article XII, § 7 of the Hawai'i Constitution than under HRS § 7–1 alone. The precise nature and scope of these rights have not been delineated by the Hawai'i Supreme Court because, as the *Kalipi* court stated, the nature and scope of ancient Hawaiian usage depends on the particular circumstances presented in each case. *Kalipi,* 66 Haw. at 12, 656 P.2d at 752. *PDF v. Paty* ensured that if the practices exercised by native Hawaiians customarily and traditionally extended beyond the boundaries of a particular ahupua'a, such ancient practices would be protected under HRS § 1–1 and article XII, § 7 of the Hawai'i Constitution. However, as that case involved appellate review of a summary judgment decision rejecting that legal proposition, there was no final determination on whether the rights asserted on behalf of PDF members were within the scope of the constitutional protection.

Similarly, in *PASH,* the supreme court was reviewing an agency decision denying standing to an organization that sought to assert rights on behalf of its native Hawaiian members. Thus, while the court gave further

---

20.  We note that many of Pratt's practices were consistent with rights reserved to ahupua'a residents in HRS § 7–1, including the right to take firewood, building materials, water, and the right of way.

guidance on the interpretation of HRS § 1–1 and article XII, § 7 of the Hawai'i Constitution, it left open the question of whether the rights asserted on behalf of PASH members were in fact within the scope of the constitutional protection.

Finally, in *Hanapi*, the supreme court rejected Hanapi's claim of constitutional privilege because Hanapi had not adduced evidence establishing "stewardship or restoration and healing of lands as an ancient traditional or customary native Hawaiian practice." *Hanapi*, 89 Hawai'i at 187, 970 P.2d at 495 (internal quotation marks omitted). However laudable Hanapi's sense of obligation to the land may have been, the court emphasized that the evidence must include a foundational connection between the claimed right and a "firmly rooted traditional or customary native Hawaiian practice." *Id.*

The somewhat indeterminate nature of ancient Hawaiian usage rights is both a help and a hindrance to the native Hawaiians who seek to assert them, the landowners who must respect them, and the State, which is mandated to protect them. On the positive side, a broad scope of ancient Hawaiian customs and traditions may be entitled to constitutional protection. On the other hand, there often is no clear guidance on whether particular activities are protected.[21] Indeed, the record of this case demonstrates the burden that this uncertainty places on all parties.

Thus, the Hawai'i Supreme Court decisions provide an analytical framework for the case-by-case determination of whether particular activities, including Pratt's, are entitled to constitutional protection. In addition, the supreme court has noted that a defendant may lay the required foundation connecting his or her claimed right to a firmly rooted traditional or customary native Hawaiian practice through expert testimony.

*Hanapi*, 89 Hawai'i at 187, 970 P.2d at 495. Accordingly, the testimony of Dr. McGregor is carefully considered. The six-point test developed by Dr. McGregor to recognize traditional and customary practice is instructive, but differs in some significant ways from the supreme court's interpretation of Hawai'i law.

Dr. McGregor's first point appears to be a core tenet of customary and traditional Hawaiian usage: the practice must be related to extended family needs; the purpose must be to fulfill a responsibility related to subsistence, religious, or cultural needs of one's family or extended family. *See, e.g.*, Hawai'i Constitution, Art. XII, § 7 (re protection of rights customarily and traditionally exercised for subsistence, cultural, and religious purposes). Although not specifically referenced by Dr. McGregor, the individual's own subsistence, religious, or cultural needs are included. At least some of Pratt's practices were related to his and his wife's subsistence, religious, and cultural needs.

Dr. McGregor's second point is also an important one, but appears to be incomplete: the practitioner must be trained by an elder from a previous generation in a practice and custom that has been passed on from one generation to the next; you cannot make it up. This point touches on an essential characteristic of protected native Hawaiian rights. Hawai'i law protects practices "associated with the ancient way of life" that have been continued, without harm to anyone. *Kalipi*, 66 Haw. at 10, 656 P.2d at 751. Put another way, the rights must have been "customarily and traditionally held by ancient Hawaiians." *PDF v. Paty*, 73 Haw. at 619, 837 P.2d at 1271. *PASH* reiterated the threshold requirement that "it is established that the application of a custom has continued in a particular area"[22] and "stress[ed]

---

**21.** Legislative attempts have failed to provide greater clarity regarding the nature and the scope of the ancient Hawaiian traditional or customary practices falling within constitutional protections. In 1997, for example, Senate Bill 8 and House Bill 1920 sought to establish procedures to resolve native Hawaiian rights claims. However, these bills were criticized as overly restrictive and otherwise problematic and were not enacted. *See generally* D. Kapua Sproat,

Comment, The Backlash Against *PASH*: Legislative Attempts to Restrict Native Hawaiian Rights, 20 U. Haw. L. Rev 321 (1998).

**22.** The *PASH* court also stated, however, that "the right of each ahupua'a tenant to exercise traditional and customary practices remains intact, notwithstanding arguable abandonment of a particular site, although this right is potentially subject to regulation in the public interest." 79

that ... non-traditional uses are not permitted." 79 Hawai'i at 442, 447, 903 P.2d at 1263, 1268. *PASH* reaffirmed that November 25, 1892 is the date by which Hawaiian usage must have been established in practice to fall within the protection of the law. It is this touchstone of ancient Hawaiian usage that is missing from Dr. McGregor's formula. In order to meet his or her burden, a practitioner must bring forward evidence that the practice handed down was an established native Hawaiian custom or tradition prior to 1892. As discussed below, Pratt failed to do so. Indeed, the District Court made no factual findings regarding whether Pratt's activities were established native Hawaiian customs or traditions prior to 1892.

Dr. McGregor's third point is that a customary or traditional practice must be conducted in "an area" that the person has a traditional connection to, either because of family that has lived there and assumed traditional responsibility or because the person is part of a halau with an established traditional responsibility and connection to the area. It is unclear from Dr. McGregor's testimony how much, if any, of this point is connected to ancient Hawaiian ways versus a modern, nontraditional formulation. As discussed above, customary or traditional native Hawaiian rights were commonly associated with a person's residence in an ahupua'a, but rights that can be demonstrated to have been granted to persons residing beyond the boundaries of an ahupua'a will be protected. *See PDF v. Paty*, 73 Haw. at 620, 837 P.2d at 1272. Without evidence of the history or origin "firmly rooting" Dr. McGregor's broader formulation in ancient customs or traditions, it cannot provide the basis for

establishing a constitutionally protected ancient Hawaiian tradition, custom, or usage. *See Hanapi*, 89 Hawai'i at 187, 970 P.2d at 495.

Dr. McGregor's testimony regarding her fourth point—that the practitioner has to be taking responsibility for an area to acquire the right of entry; the right of access has to be to fulfill a traditional responsibility that has been given to the practitioner by his or her family or the kumu of a halau—is similarly disconnected from any reference to ancient practices. Indeed, the supreme court rejected Hanapi's "assumption" of responsibility based on his sense of obligation to the land, as a native Hawaiian tenant, to justify his entry to his neighbor's property. *Hanapi*, 89 Hawai'i at 187, 970 P.2d at 495. There is no testimony or other evidence in this case establishing that, in ancient times, a family or halau could "assume" certain responsibilities unassociated with lawful residency in an ahupua'a and then pass it on to the next generation, as opposed to being given responsibilities by a king or chief. In addition, Pratt offered no evidence that he had any such family history or halau relationship with respect to "taking responsibility for" Kalalau Valley.

Dr. McGregor's fifth point, that a practice cannot be for a commercial purpose, appears to have a solid foundation in Hawai'i law and custom. HRS § 7–1, for example, specifically states that the people "shall not have a right to take such articles to sell for profit." To take, without permission, even the natural products of the land of another for commercial purposes—as opposed to subsistence, religious, or cultural purposes—would appear to conflict with the traditional Hawaiian val-

---

Hawai'i at 450, 903 P.2d at 1271. In conjunction with this statement, the court referenced its earlier footnote citing Blackstone's Commentaries on the law of custom. The referenced parts include that the custom must be exercised without interruption—as to the right versus the exercise thereof. Blackstone opined that "the custom is not destroyed, though they do not use it for ten years; it only becomes more difficult to prove." *Id.* at 441, n. 26, 903 P.2d at 1262 n. 26 (citation and internal quotation marks omitted). Thus, it appears that the supreme court would, under some circumstances, allow the exercise of ancient practices at sites where the practice had been abandoned, if the evidence is sufficient to

show that the persons seeking to engage in that practice would have been allowed to do so pursuant to ancient Hawaiian customs or traditions. The same quoted passage by Blackstone also states that the custom must be "peaceable and free from dispute (i.e., exercised by consent)" and reasonable. *Id.* at 441, n. 26, 903 P.2d at 1262 n. 26 (citation and internal quotation marks omitted). This would appear to be consistent with the supreme court's view of ancient Hawaiian customs, i.e., that "the non-confrontational aspects of traditional Hawaiian culture should minimize potential disturbances." *Id.* at 447, 903 P.2d at 1268.

ues of cooperation, non-interference, and respect for the rights of others. *See, e.g., Kalipi,* 66 Haw. at 8–9, 656 P.2d at 749–50 (discussing traditional Hawaiian way of life).

Similarly, Dr. McGregor's sixth and final point is consistent with Hawai'i law: the manner in which the practice is conducted must be consistent with tradition and custom; in some cases, there is a protocol, a cleansing, or a chant, and the practice must be conducted in a respectful manner. *See, e.g., PASH,* 79 Hawai'i at 442, 903 P.2d at 1263 (rejecting nontraditional practices or even valid customary rights exercised in an unreasonable manner).

Instead of providing the necessary connection between Pratt's claimed rights and the historical, ancient Hawaiian roots of the claimed rights, Dr. McGregor offered her own conclusions on the issue of whether Pratt was engaged in customary and traditional practices, based on her six-point formulation. This testimony stands in sharp contrast to the affidavit testimony offered by Dr. McGregor and others, in *PDF v. Paty* :

> If, as argued by PDF, the customary and traditional rights associated with tenancy in an ahupua'a extended beyond the boundaries of the ahupua'a, then article XII, § 7 protects those rights as well. The drafters of the constitutional amendment emphasized that all such rights were reaffirmed and that they did not intend for the provision to be narrowly construed. We therefore hold that native Hawaiian rights 'protected by article XII, § 7 may extend beyond the ahupua'a in which a native Hawaiian resides where such rights have been customarily and traditionally exercised in this manner.
>
> *PDF has presented evidence supporting the contention that the access and gathering patterns of tenants in Puna do not appear to have conformed to the usual notion that tenants exercised such rights only within the boundaries of a given ahupua'a. Affidavits [including Dr. McGregor's] suggest that Puna region ahupua'a tenants accessed all portions of the Puna Forest Reserve for hunting and gathering, and were not limited to just the narrow corridor of their ahupua'a. The practice*

*of accessing the area as a common area for gathering and hunting by tenants of the Puna district may have commenced from the time of the Great Mahele and Kuleana Acts. One affiant testified that early trails accessed the Puna Forest Reserve from many ahupua'a, the lava tube extending into the Puna Forest Reserve extends across several ahupua'a and has entry points in more than one ahupua'a, and this area was associated with Pele and her family, and not with any particular ahupua'a.*

*PDF v. Paty,* 73 Haw. at 620–21, 837 P.2d at 1272 (footnotes omitted; emphasis added).

There is no doubt that, as Dr. McGregor opined, some of Pratt's activities were "subsistence-related" inasmuch as he was clearing land and planting food and medicinal plants on State land for subsistence purposes. The issue in this case, however, is not simply whether ancient Hawaiians customarily and traditionally cleared land and planted food and medicinal plants for subsistence use. The issue is more closely akin to whether ancient Hawaiians who resided elsewhere on the island of Kaua'i customarily and traditionally conducted such activities, without permission, on the land of others in Kalalau Valley. The record is devoid of evidence supporting this proposition. There are no related findings of fact from which a legal conclusion could be drawn.

Similarly, Dr. McGregor opined that "temporary residence for extended time is a traditional customary practice" because "it's necessary to fulfill the responsibilities of caring for the land and caring for the cultural sites and religious sites." Much like the evidence presented in *Hanapi,* this evidence assumed rather than established the existence of a constitutionally protected customary right to appoint oneself as the person responsible for caring for Kalalau Valley and overseeing, restoring, and rededicating its historical, religious and cultural sites. In Dr. McGregor's example of the rebuilding or dedication of a luakini or sacrificial heiau in ancient Hawaii, it was King Kamehameha who ordered this activity to empower him in his wars of conquest. There is no evidence in the record, and no factual findings, that it was customary

that an ancient Hawaiian person of lesser rank could simply take such responsibilities onto himself or herself.

■ The District Court's unchallenged findings of fact include that, among other things, Pratt set up residence in Kalalau Valley, without permission, cleared the land, built a shelter, and planted crops. It is primarily this conduct, not Pratt's exercise of other traditional and cultural practices, that must constitute a constitutionally protected customary or traditional native Hawaiian right. Nothing in Dr. McGregor's testimony supports the conclusion that ancient Hawaiian usage included such an extensive right to take up residency, cultivate, and modify for one's own use the land of others, even if that use involves otherwise recognized customary or traditional subsistence, religious or cultural practices.[23] Nor does Pratt's other evidence support that conclusion. Nor do the District Court's findings of fact support that conclusion. Thus, Pratt failed to meet his burden to demonstrate that his conduct fell within the scope of the constitutional protection.[24]

### D. Pratt's Arguments re the Balancing of Interests

■ Contrary to Pratt's claim, *Hanapi* did not establish a *per se* rule that upon presentation of evidence of each of the three *Hanapi* factors, a defendant's conduct is deemed to be constitutionally protected and exempt from prosecution. Rather, *Hanapi* made clear that the evidence in support of the three factors are the *minimum* a defendant has to show in support of a claim that his or her conduct was constitutionally protected as a native Hawaiian right and exempt from prosecution. Indeed, the supreme court emphasized in *Hanapi* that it was the *reasonable* exercise of customary and traditional native Hawaiian practices that was entitled to protection under the Hawai'i Constitution. The reasonableness requirement is also implicit in article XII, § 7 of the Hawai'i Constitution:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, *subject to the right of the State to regulate such rights.*

(Emphasis added).

Thus, even if this court were to conclude that Pratt met his burden of showing that Pratt's conduct in setting up a residence, clearing land, and planting crops on State land in Kalalau Valley, without permission, constituted a customary or traditional native Hawaiian practice, the District Court was not required to dismiss the charges solely on that basis. The District Court's consideration of a balancing of interests was necessary to the court's legal determination of whether, under the circumstances before the court, the exercise of customary and traditional native Hawaiian practices was constitutionally protected. We therefore conclude that the District Court did not err in considering a balancing of interests in this case.

23. Dr. McGregor did testify that:

> [In] several areas of our islands, and including Kalalau, there's a history of seasonal residents so that Hawaiian families, especially in the summertime in areas in valleys that were inaccessible in the wintertime, during the summertime they would go to areas near the shoreline where they could fish and salt the fish so they would build up a reserve of food for the wintertime when they couldn't exit from the valley and could not go fishing and get the fish that they needed for their protein source.
>
> So you have throughout the island this practice of seasonal residents near shorelines along the ocean for extended periods of time especially in the summer months, and then other times they would live inland during the rainy winter months.

This testimony provides evidence that residents of Kalalau, like other residents of ancient Hawai'i, moved seasonally from the shoreline to the mountains within their ahupua'a. It does not, as argued by counsel at oral argument, provide evidence that ancient Hawaiians from other ahupua'as customarily and traditionally took up residence in Kalalau, built shelters, cleared land and planted crops, without appointment or permission, in order to care for the valley's cultural and religious sites.

24. The record amply supports the conclusion that Kalalau Valley is undeveloped land, the third requirement under *Hanapi.*

In addition, even if this court were to conclude that Pratt met his burden of showing that his conduct constituted a customary or traditional native Hawaiian practice, the District Court did not err in ruling that the balance of interests weighed in favor of the State and against Pratt. Without question, under Hawai'i law, the State must protect the reasonable exercise of customary or traditional native Hawaiian rights, to the extent feasible, but the State is authorized to impose appropriate regulations to govern the exercise of these rights. *See, e.g.,* article XII, § 7 and *PASH,* 79 Hawai'i at 450–51, 903 P.2d at 1271. Accordingly, the State must allow native Hawaiians reasonable access to undeveloped State lands to conduct customary or traditional ancient Hawaiian subsistence, religious or cultural practices associated with such lands. It is not, however, *per se* unreasonable for the State to use a permitting system to regulate the use of sensitive natural and cultural resources.

In this case, DLNR Representative Souza testified that the purpose of the subject regulation is to protect State property and park resources, and to protect the safety and welfare of the public. Souza's unchallenged testimony was that human sewage was a problem in Kalalau Valley because the self-composting toilets in the valley can handle only a limited number of people and, when that number is exceeded, they have experienced failures. He also testified regarding the rich cultural resources, native plant communities, native sea birds, and historic sites in Kalalau Valley. Pratt himself submitted into evidence the Archaeological Survey that echoed the fragile nature and importance of the Kalalau Valley resources and the detrimental impacts of human waste and overuse.

There is no evidence that Pratt attempted but was unable to get a camping permit in order to conduct his cultural and religious practices, albeit for shorter periods of time.[25] There is no evidence that limiting the number of visitors and length of stay in the valley

was unreasonable, in conjunction with the health, safety, and resource protection issues. Likewise, it is not unreasonable for the State to manage, supervise, and direct any restoration of ancient Hawaiian sites at Kalalau through stewardship or curatorship programs, such as the ones identified by Souza, or through management plans or even consensual rededication of sites for the use of native Hawaiians, as suggested by Dr. McGregor.

Accordingly, the District Court did not err in ruling that the balance of interests weighed against Pratt and in denying Pratt's claim of constitutional privilege.

### E. Pratt's Other Points on Appeal

Pratt's argument that his prosecution violated the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb (**the Act**), is without merit. The State's action in citing Pratt for unpermitted camping in Kalalau Valley did not substantially burden Pratt's exercise of his religious practices. Through the use of a camping permit or other lawful means, Pratt could have conducted his religious practices in the valley. Pratt cites no cases or other legal authorities that extend the protection of religious freedoms under the Act to setting up residence, clearing, and planting crops on government land, without permission, in furtherance of one's religious practices.

Pratt's arguments that the District Court's interpretation of *Hanapi* violated the ex *post facto* clause of the United States and Hawai'i Constitutions, the rule of lenity, and the principles of *stare decisis* are also without merit. First, the constitutional prohibition against ex *post facto* measures generally applies to legislative enactments and not judicial decision-making. *See, e.g., State v. Jess,* 117 Hawai'i 381, 407, 184 P.3d 133, 159 (2008). Moreover, this court rejects Pratt's argument that the District Court's consideration of the State's interests, as well as

25. As the issues herein are limited to Pratt's assertion of a constitutional privilege in defense to a criminal charge and the particular facts and circumstances presented in this case, this case does not involve the issue of possible civil actions by native Hawaiians against the State for an alleged failure to allow reasonable access to State lands for customarily and traditionally exercised subsistence, cultural, and religious practices.

Pratt's, was inconsistent with or unsupported by *Hanapi*. Pratt has not offered any authority supporting his assertion that the rule of lenity should be applied in this case because Hawai'i case law concerning the applicability of the constitutional privilege defense is ambiguous and uncertain. Pratt's argument that the District Court deviated from the ruling in *Hanapi*, and therefore violated the principles of *stare decisis*, is unfounded. Accordingly, we reject Pratt's argument that his convictions should be reversed on these grounds.

## VI. *Conclusion*

It appears from the record that Pratt is a deeply spiritual Hawaiian man who has exhibited, over many years, a profound sense of connection with, commitment to, and caring for the remnants of the ancient Hawaiian community that once inhabited a beautiful and isolated Kaua'i valley that is now a State wilderness park. He wants to protect and restore the ancient sites in Kalalau, while living there in a way that ancient Hawaiians once lived in the valley. He wants to be a good steward, a devoted cultural and religious practitioner, and even a good neighbor to visitors that come to Kalalau to enjoy its unique beauty and its natural and cultural treasures. There is much to admire in these aspirations.

The issue before us, however, is whether Pratt has demonstrated that he has a constitutionally protected right to reside in Kalalau Valley in order do these things, without permission, input, supervision, limitation, or oversight from the State. While the Hawai'i Constitution, statutes, and case law mandate that ancient Hawaiian customs and traditions be protected, they do not go so far as to allow native Hawaiians to reside on State lands, without permission, in order to bring ancient ways and ancient sites back to life. As Dr. McGregor testified, there are instances where, through planning and cooperation, ancient sites have been rededicated and are now a living part of the Hawaiian culture and practice. However, the issue of whether all

or part of Kalalau Valley should be restored and rededicated is not properly before the court. The issue before the court is whether Pratt met his burden to show that his conduct fell within the protections of article XII, § 7 of the Hawai'i Constitution.

For the reasons set forth herein, we conclude that Pratt did not meet his burden of proof regarding his claim of constitutional privilege. Accordingly, the District Court's June 16, 2006 Judgments are affirmed.

Concurring Opinion of FUJISE, J.

I concur in the result of the plurality opinion, affirming the conviction of Lloyd Pratt (Pratt) for three violations of Hawai'i Administrative Rules § 13–146–4, requiring compliance with officially posted signs governing the "extent and scope of closure" and "visiting hours" pertaining, in this case, to Kalalau State Park. Contrary to Pratt's argument on appeal that the district court erred in adding a "fourth prong" to his claim of constitutionally privileged conduct under *State v. Hanapi*, 89 Hawai'i 177, 970 P.2d 485 (1998), I agree, for the reasons stated in the plurality opinion, that proof of the three prongs identified in *Hanapi* was only the minimum showing Pratt was required to make. Consequently, it was not error for the district court to require a showing that Pratt's exercise of this privilege was reasonable under the circumstances of this case, and to conclude that he failed to make such a showing.[1]

However, I write separately because, in my view, as the State has not cross-appealed from the district court's ruling that Pratt satisfied the three *Hanapi* prongs and that the district court was correct in considering the State's right to regulate the exercise of customary and traditional native Hawaiian rights, our determination that the district court did not err in ruling that the balance of interests weighed in favor of the State is dispositive. *Application of Hawaiian Elec. Co., Inc.*, 56 Haw. 260, 267, 535 P.2d 1102, 1107 (1975) (declining to decide an issue not briefed by the parties where alternative basis was dispositive).

---

1. I also agree with the plurality opinion that Pratt's remaining points on appeal are without merit.

Concurring and Dissenting Opinion by NAKAMURA, C.J.

In my view, this case should be decided based on the way in which it was litigated by the parties. The parties litigated this case on the basis that Defendant–Appellant Lloyd Pratt (Pratt) had satisfied the three factors set forth by the Hawai'i Supreme Court in *State v. Hanapi*, 89 Hawai'i 177, 970 P.2d 485 (1998), including that Pratt had met his burden of demonstrating that he was engaged in customary or traditional native Hawaiian practices that fell within the scope of Article XII, section 7 of the Hawai'i Constitution. With respect to Pratt's claim of constitutional privilege, the only issues disputed by the parties in the trial court and on appeal are: 1) whether in addition to the *Hanapi* factors, a balancing of interests should be considered in determining whether Pratt's charged conduct was constitutionally protected and exempt from prosecution; and 2) how that balancing of interests should be resolved in this case.

I agree with the lead and concurring opinions that a defendant's satisfaction of the three *Hanapi* factors is not sufficient to establish that his or her conduct is constitutionally protected and exempt from prosecution. I also agree that it is the reasonable exercise of customary and traditional native Hawaiian practices that is constitutionally protected and that the trial court was entitled to consider a balancing of interests in evaluating Pratt's claim of constitutional privilege. On these points, I concur in the analysis of the lead and concurring opinions.

However, I do not agree that the trial court was correct in ruling that the balance of interests weighed against Pratt and in favor of Plaintiff–Appellee State of Hawai'i (State). In my view, the evidence presented did not show that Pratt's practices resulted in any actual harm. I believe that the trial court erred in denying Pratt's claim of constitutional privilege, and I would reverse Pratt's convictions. Accordingly, I respectfully dissent from this court's decision to affirm Pratt's convictions.

I.  BACKGROUND

Pratt appeals from three Judgments filed on June 16, 2006, in the District Court of the Fifth Circuit (trial court). Officers of the Department of Land and Natural Resources (DLNR) observed Pratt in closed areas of Kalalau State Park on three occasions. Pratt was cited for failing to observe and abide by the officially posted signs designating closed areas and visiting hours for Kalalau State Park, in violation of Hawai'i Administrative Rules (HAR) § 13–146–4 (1999).[1]

Pratt moved to dismiss the citations, arguing that he had been engaged in constitutionally protected customary and traditional native Hawaiian practices in Kalalau State Park and was thus exempt from prosecution on the citations. The trial court denied Pratt's motion. Following a bench trial on the three alleged violations, Pratt was found guilty as charged. He was sentenced to a total of 60 hours of community service.

On appeal, Pratt argues, among other things, that: 1) the trial court erred by adding a "balancing of interests" factor to the three factors identified in *Hanapi* in evaluating whether Pratt's conduct was exempt from prosecution; and 2) the trial court erred by ruling that the balance of interests weighed in favor of the State.

A.

DLNR Officers cited Pratt on three separate occasions for violating HAR § 13–146–4.

1.  HAR § 13–146–4 provides as follows:

§ 13–146–4  *Closing of areas.*  (a) The board or its authorized representative may establish a reasonable schedule of visiting hours for all or portions of the premises and close or restrict the public use of all or any portion thereof, when necessary for the protection of the area or the safety and welfare of persons or property, by the posting of appropriate signs indicating the extent and scope of closure.  All persons shall observe and abide by the officially posted signs designating closed areas and visiting hours.

(b) Vehicles left unattended in closed areas may be impounded by the board or its authorized representative at any time.

(c) All impounded vehicles shall be towed to a place of storage.  Towing, storage and other related 13–146–7 costs shall be assessed pursuant to section 290–11, HRS [ (Hawaii Revised Statutes) ].

On each occasion, Pratt was present in an area of Kalalau State Park that was closed and was found camping in that area. Signs were posted stating that the area was closed. Pratt saw the signs and had actual knowledge that the area in which he was camping was a closed area. Pratt did not have a permit to camp in Kalalau State Park during the times he was cited.

## B.

Pratt moved to dismiss the citations on the ground that he was exempt from prosecution for the alleged violations of HAR § 13–146–4 because his activities in Kalalau State Park were constitutionally protected as customary and traditional native Hawaiian practices. In support of his motion, Pratt asserted that

> [Pratt] is native Hawaiian, and a "kahu" or religious practitioner. [Pratt] is licensed in the State of Hawai'i to perform marriages. As part of his traditional practice, and his role as a "hoa'aina", or caretaker of the land, [Pratt] travels to Kalalau Valley on the North Shore of Kaua'i to tend to the heiau in the Valley, perform cultural ceremonies, clean and repair the ancient terraces, and replant native flora species.

(Citations omitted.) Pratt stated that on each of the dates he was cited, he was present in Kalalau Valley to fulfill his responsibilities as kahu and hoa'aina.

The trial court held an evidentiary hearing on Pratt's motion to dismiss. At the hearing, Pratt presented evidence that he is a native Hawaiian, including a genealogy chart registered with the Department of Hawaiian Home Lands, which extended back three generations on his father's side and two generations on his mother's side. Although the name Kupihea does not appear on the chart, it was Pratt's unchallenged testimony that the Kupihea family, who held property in the Kalalau ahupua'a and resided in Kalalau Valley, was part of his family line on his father's side. Pratt testified that the area where he

spends time in Kalalau Valley, and where he was cited, is at or near where the Kupihea family held property and where his ancestors are buried.

Pratt stated that he was exposed as a child to traditional and customary native Hawaiian practices by growing up with Hawaiians from Ni'ihau and that as an adult, he was taught such practices by traditional and customary native Hawaiian practitioners on Kaua'i. Pratt testified that he is a "kahu"[2] or religious practitioner and that as part of what he feels is his cultural and traditional obligation as a kahu, he would travel periodically to Kalalau Valley to clean and tend to the heiau there. Pratt stated that he has been going into Kalalau Valley for thirty-seven years;[3] he has not seen any other kahu performing the type of work he was doing in Kalalau Valley. Pratt testified that he cleared overgrown bushes and rubbish left by campers from the heiau; that it takes eight to ten hours to hike to the heiau and two days for him to recuperate from the hike; and that he planted bananas, coconut trees, and other traditional plants for subsistence.

Pratt called Davianna McGregor, Ph.D., (Dr. McGregor), a professor of ethnic studies at the University of Hawai'i at Manoa, as an expert witness. Dr. McGregor has done extensive research on native Hawaiian customs and traditions, and she has developed criteria for evaluating whether a person is engaged in customary and traditional native Hawaiian practices. Dr. McGregor testified that in her opinion, Pratt was "engaging in traditional and customary native Hawaiian customs and practices related to subsistence and cultural and religious purposes" while in Kalalau Valley.

The State called Wayne Souza (Souza), the DLNR Parks District Superintendent for Kaua'i. Souza testified that the purpose of the regulation establishing closed areas and visiting hours is to protect property and the health, safety, and welfare of the public.

---

2. "Kahu" is defined as "[h]onored attendant, guardian, nurse, keeper of 'unihipili bones, regent, keeper, administrator, warden, caretaker, master, mistress; pastor, minister, reverend, or preacher of a church[.]" M. Pukui & S. Elbert, *Hawaiian Dictionary* 113 (1986).

3. It is unclear from the record whether Pratt asserts that he was tending to the heiau during the entire thirty-seven year period.

There is a similar purpose for the camping regulations, which require a permit for camping and thereby limit the number of people in the park. Souza testified that with respect to Kalalau State Park, excess sewage is the DLNR's most important concern. In the past, the self-composting toilets in Kalalau State Park have failed because they have a limited capacity and too many people were in the park. Souza also noted that the DLNR tries to keep Kalalau State Park "low density so people can have a wilderness type of experience." The DLNR has a curatorship program, where people interested in preserving heiau can apply to the DLNR to perform such work in state parks. Souza, however, was not familiar with the specific protocols and requirements for the curatorship program.

### C.

At the conclusion of the evidentiary hearing on Pratt's motion to dismiss, the trial court directed the parties to submit post-hearing briefs for it to consider before ruling on the motion. In its post-hearing brief, the State conceded that "based on Dr. Davianna Pomaikai McGregor's testimony, the State does not dispute that the activities described [ (i.e., Pratt's actions in Kalalau State Park) ] are traditional and customary Native Hawaiian practices." However, the State argued that the exercise of traditional and customary native Hawaiian practices was subject to government regulation and that in this case, the State was entitled to enforce its regulations against Pratt.

The trial court denied Pratt's motion to dismiss by a written decision and order. The trial court determined that Pratt satisfied the three factors identified in *Hanapi*, stating that "[i]t is undisputed, based on the testimony elicited at the [evidentiary] hearing and concessions made by the State in its brief, that Mr. Pratt is [1] a native Hawaiian, [2] that he carried out customary or traditional native Hawaiian practices in Kalalau, and [3] that this exercise of rights occurred on undeveloped or less than fully developed land." (Numerical brackets in original.) The trial court, however, concluded that even with such a showing, case and statutory law all

suggest that the court must "accommodate competing interests and only uphold such rights and privileges reasonably exercised and to the extent feasible and subject to the right of the State to regulate such rights." (Internal quotation marks, ellipsis points, and citations omitted.)

The trial court found that Pratt had set up a "residence" in Kalalau Valley; had cleared large areas, some of which were at ancient heiau sites; and had planted food gardens, which included bananas, taro, and coco palms, using a garden hose for watering. It cited Souza's testimony that controlling access to Kalalau State Park through regulations was necessary to protect the area, conserve park resources, and provide for the health and safety of visitors, with sewage being the DLNR's number one concern. The trial court raised the question of whether allowing Pratt's conduct would result in a whole community being created in Kalalau State Park. It also noted that applying for a camping permit or the curatorship program provided a potential means for Pratt to engage in traditional native Hawaiian practices without violating the DLNR's regulations.

The trial court determined that the State's interest in protecting and preserving its valuable asset in Kalalau State Park, when balanced against the rights expounded by Pratt, weighed in favor of the State. It therefore denied Pratt's motion to dismiss.

### D.

After the trial court denied Pratt's motion to dismiss, the parties agreed to a trial on stipulated facts and the testimony presented on the motion to dismiss. At the conclusion of the trial, Pratt was found guilty as charged on all three violations. The trial court subsequently filed written "Findings of Fact and Conclusions of Law." In its findings of fact, the trial court repeated its determination that "[b]ased on the testimony elicited at the [evidentiary] hearing and concessions made by the State in its brief, the Court finds that Mr. Pratt is [1] a native Hawaiian, [2] that he carried out customary or traditional native Hawaiian practices in Kalalau at the time of the camping, and [3] that this exercise of rights occurred on undeveloped or

less than fully developed land." (Numerical brackets in original.) The trial court concluded that although Pratt satisfied the three *Hanapi* factors, a balancing of interests revealed that the State's interests in protecting and preserving Kalalau State Park outweighed the rights expounded by Pratt.

## II. DISCUSSION

### A.

The record contains uncontested testimony that Pratt's ancestors held property, resided, and were buried in Kalalau Valley near the area where Pratt was cited for being illegally present; that Pratt is a kahu and had been going into Kalalau State Park for thirty-seven years; that as a kahu, Pratt cleaned and tended to the heiau in Kalalau State Park; and that while in Kalalau State Park, Pratt carried out customary and traditional native Hawaiian practices.

In particular, the State did not present any evidence to dispute Dr. McGregor's testimony and did not challenge Pratt's claim that he was engaging in traditional and customary native Hawaiian practices while in Kalalau State Park. Indeed, after hearing Dr. McGregor's testimony, the State conceded that Pratt's actions in Kalalau State Park constituted traditional and customary native Hawaiian practices. Pratt also presented undisputed evidence that he is a native Hawaiian and that his activities took place on undeveloped land in Kalalau State Park.

Based on the undisputed evidence and the State's concessions, the trial court made findings regarding the three *Hanapi* factors and concluded that Pratt satisfied the *Hanapi* factors. The State does not challenge the trial court's ruling on the *Hanapi* factors on appeal.

In my view, by its actions in the trial court and on appeal, the State abandoned or waived any claim that Pratt failed to satisfy the three *Hanapi* factors. *See State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) (stating the general rule that if a party fails to raise an argument at trial, that argu-

ment will be deemed to be waived on appeal); *State v. Harada*, 98 Hawai'i 18, 30, 41 P.3d 174, 186 (2002) (concluding that the prosecution failed to properly preserve its exigent circumstances claim and thus waived it); *State v. Anger*, 105 Hawai'i 423, 432–33, 98 P.3d 630, 639–40 (2004) (applying the doctrine of judicial estoppel in declining to address an argument by the prosecution-appellee that was inconsistent with the position the prosecution had taken in the trial court); *State v. Steelman*, 93 S.W.3d 102, 106–07 (Tex.Crim.App.2002) (en banc) (declining to address constitutional argument abandoned by the parties). Thus, this court need not address whether Pratt satisfied the *Hanapi* factors, but should decide this appeal based upon the position taken by both parties in the trial court, namely, that Pratt had satisfied the three *Hanapi* factors.[4]

### B.

Pratt asserts that his satisfaction of the three *Hanapi* factors was sufficient to establish that the conduct for which he was cited was constitutionally protected and exempt from prosecution, as a matter of law. He therefore argues that the trial court erred by adding a "balancing of interests" factor to the three *Hanapi* factors in evaluating whether Pratt was exempt from prosecution. I join my colleagues in concluding that Pratt's satisfaction of the *Hanapi* factors did not per se establish that he was exempt from prosecution.

### 1.

In *Hanapi*, the defendant, a native Hawaiian artist and cultural practitioner, was charged with criminal trespass for refusing to leave his neighbor's property. *Hanapi*, 89 Hawai'i at 178–79, 970 P.2d at 486–87. On the previous two days, Hanapi had entered his neighbor's property without incident to observe restoration work in fishponds adjoining Hanapi's and his neighbor's properties. *Id.* at 178, 970 P.2d at 486. On the third day, Hanapi was told not to enter the neighbor's

---

4. At oral argument, the State acknowledged that it had conceded that Pratt had satisfied the *Hanapi* factors, and it acknowledged that Pratt and

the trial court were entitled to rely on this concession.

property, ignored that warning, and was arrested when he refused to leave. *Id.* Hanapi maintained that for generations, his family and ancestors practiced traditional native Hawaiian religious, gathering, and sustenance activities in and around the fishponds. *Id.* Hanapi claimed that when he was arrested for trespass, he was exercising his constitutionally protected rights as a native Hawaiian. *Id.* at 185, 970 P.2d at 493. Hanapi asserted that he was on the neighbor's property to perform religious and traditional ceremonies of healing the land and to ensure that the fishponds were restored properly by his neighbor. *Id.*

The Hawai'i Supreme Court held that Hanapi had the burden of demonstrating that his activities were constitutionally protected. The court noted that "[w]hen a criminal defendant claims to have been engaged in a constitutionally protected activity, the burden is placed on him or her to show that his or her conduct fell within the prophylactic scope of the constitution's provision." *Id.* at 183, 970 P.2d at 491. The court held that "it is the obligation of the person claiming the exercise of a native Hawaiian right to demonstrate that the right is protected." *Id.* at 184, 970 P.2d at 492.

In discussing the development of the law, the supreme court emphasized that it was the *reasonable* exercise of customary and traditional native Hawaiian practices that is constitutionally protected.

> This court has consistently recognized that "the *reasonable* exercise of ancient Hawaiian usage is entitled to protection under article XII, section 7." *Public Access Shoreline Hawai'i [Hawaii] v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 442, 903 P.2d 1246, 1263 (1995) (hereinafter "*PASH*") (emphasis in original). *See also Kalipi v. Hawaiian Trust Co., Ltd.,* 66 Haw. 1, 656 P.2d 745 (1982) (recognizing Hawai'i's constitutional mandate to protect traditional and customary native Hawaiian rights); *Pele Defense Fund v. Paty,* 73 Haw. 578, 620, 837 P.2d 1247, 1272 (1992) (upholding the "*Kalipi* rights" defining the "rudiments of native Hawaiian rights protected by article XII, § 7" of the Hawai'i Constitution). In *PASH*, we further examined the legal developments of land tenure in Hawai'i and concluded that "the issuance of a Hawaiian land patent confirmed a limited property interest as compared with typical land patents governed by western concepts of property." *Id.*

> Although *PASH* did not discuss the precise nature of Hawaii's "limited property interest," one limitation would be that constitutionally protected native Hawaiian rights, reasonably exercised, qualify as a privilege for purposes of enforcing criminal trespass statutes.

*Id.* at 184, 970 P.2d at 492 (emphasis in original).

The court then identified three factors that a defendant, "*at minimum,*" must show "[i]n order . . . to establish that his or her conduct is constitutionally protected as a native Hawaiian right. . . ." *Id.* at 185–86, 970 P.2d at 493–94 (emphasis added). "First, he or she must qualify as a 'native Hawaiian' within the guidelines set out in *PASH*." *Id.* at 186, 970 P.2d at 494. The court noted that in *Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 903 P.2d 1246 (1995) (*PASH*), it stated that " 'those persons who are "descendants of native Hawaiians who inhabited the islands prior to 1778," and who assert otherwise valid customary and traditional Hawaiian rights are entitled to constitutional protection *regardless of their blood quantum.*' " *Id.* at 186, 970 P.2d at 494 (quoting *PASH,* 79 Hawai'i at 449, 903 P.2d at 1270) (brackets omitted; emphasis in original).

"Second, once a defendant qualifies as a native Hawaiian, he or she must then establish that his or her claimed right is constitutionally protected as a customary or traditional native Hawaiian practice." *Id.* at 186, 970 P.2d at 494.

"[Third], a defendant claiming his or her conduct is constitutionally protected must also prove that the exercise of the right occurred on undeveloped or 'less than fully developed property.' " *Id.* (citation omitted). The court clarified *PASH* by holding that "if property is deemed 'fully developed,' i.e., lands zoned and used for residential purposes with existing dwellings, improvements, and infrastructure, it is *always* 'inconsistent' to

permit the practice of traditional and customary native Hawaiian rights on such property." *Id.* at 186–87, 970 P.2d at 494–95 (footnote omitted; emphasis in original). The court stated that "[i]n accordance with *PASH*, however, we reserve the question as to the status of native Hawaiian rights on property that is 'less than fully developed.'" *Id.* at 187, 970 P.2d at 495 (citation omitted).

The supreme court held that Hanapi failed to satisfy the second factor because he did not adduce sufficient evidence to prove "that his conduct, at the time of his arrest, represented the exercise of a traditional or customary native Hawaiian right...." *Id.* at 187, 970 P.2d at 495. The supreme court therefore concluded that the trial court had properly rejected Hanapi's claim of constitutional privilege. *Id.*

2.

Contrary to Pratt's claim, *Hanapi* did not establish a per se rule that satisfaction of the three *Hanapi* factors means that a defendant's conduct is constitutionally protected and exempt from prosecution. Instead, *Hanapi* made clear that the three factors were the *minimum* a defendant had to show in support of a claim that his or her conduct was constitutionally protected as a native Hawaiian right and exempt from prosecution. In discussing the third factor—that the defendant's claimed constitutionally protected conduct occurred on undeveloped or less than fully developed property—the supreme court specifically "reserve[d] the question as to the status of native Hawaiian rights on property that is 'less than fully developed.'" *Id.* (citation omitted). There would be no need to reserve that question if satisfying the three factors automatically meant that a defendant's conduct was constitutionally protected and exempt from prosecution.

As noted in my colleague's lead opinion,

the supreme court emphasized in *Hanapi* that it was the *reasonable* exercise of customary and traditional native Hawaiian practices that was entitled to protection under the Hawai'i Constitution. The reasonableness requirement is also implicit in article XII, § 7 of the Hawai'i Constitution:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, *subject to the right of the State to regulate such rights.*

(Emphasis added).

As specified in *Hanapi,* satisfying the three *Hanapi* factors (the minimum a defendant must show) was a necessary but not a sufficient condition that Pratt was required to meet in order to demonstrate that his conduct was constitutionally protected and exempt from prosecution for violating the DLNR regulation. Accordingly, the trial court was not required to dismiss the charges against Pratt based solely on its finding that he had satisfied the three *Hanapi* factors. The trial court's consideration of a balancing of interests was relevant to whether Pratt's exercise of customary and traditional native Hawaiian practices was reasonable. I therefore join my colleagues in concluding that the trial court did not err in considering a balancing of interests in evaluating whether Pratt had met his burden of establishing that his conduct was constitutionally protected and exempt from prosecution for violating the DLNR regulation.[5]

C.

Pratt argues that even if the trial court is allowed to apply a balancing test in addition

---

**5.** I also reject Pratt's claims that by adding a balancing of interests factor to the three *Hanapi* factors, the trial court violated the principle of stare decisis, the ex post facto clause, and the rule of lenity. As noted, the trial court's use of a balancing of interests factor was fully consistent with and supported by *Hanapi*. Thus, the trial court did not violate the principle of stare decisis or the ex post facto clause, even assuming *ar-* *guendo* that the ex post facto prohibition applies to judicial decisions. The trial court's application of a balancing of interests factor did not involve an interpretation of an ambiguous criminal statute, *see State v. Kalani,* 108 Hawai'i 279, 288, 118 P.3d 1222, 1231 (2005), but rather the straightforward interpretation of *Hanapi*. The trial court's consideration of a balancing of interests did not violate the rule of lenity.

to the *Hanapi* factors, the trial court erred in ruling that the balance of interests weighed in favor of the State and against Pratt. I agree with Pratt.

"[T]he State is obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible." *PASH,* 79 Hawai'i at 450 n. 43, 903 P.2d at 1271 n. 43. The Hawai'i Supreme Court has "upheld the rights of native Hawaiians to enter undeveloped lands owned by others to practice continually exercised access and gathering rights necessary for subsistence, cultural or religious purposes so long as no actual harm was done by the practice." *Pele Defense Fund v. Paty,* 73 Haw. 578, 619, 837 P.2d 1247, 1271 (1992). Thus, in analyzing the balance of interests between Pratt and the State and whether Pratt's exercise of traditional and customary native Hawaiian practices in Kalalau State Park was reasonable, we must look to whether Pratt's conduct resulted in actual harm.

The State asserted that its primary concern, which was addressed by the regulation Pratt was cited for violating, was excess sewage. However, there was no evidence pre-

sented that Pratt's presence in closed areas of Kalalau State Park had caused or contributed to an excess sewage problem. Indeed, the State did not offer any substantial evidence that Pratt's activities in Kalalau State Park had done any actual harm. Although the trial court raised the question of whether permitting Pratt's conduct might result in the creation of a whole community in Kalalau State Park, Pratt testified, without contradiction, that he had not seen any other kahu performing the type of work he was performing in Kalalau State Park.[6]

Based on the State's concessions and the evidence presented in this case, I conclude that the trial court erred in ruling that the balance of interests weighed against Pratt and in denying Pratt's claim of constitutional privilege. Accordingly, I would reverse Pratt's convictions.

---

6. The State also presented evidence that the DLNR has a curatorship program. However, Souza, the State's only witness, testified that he was not familiar with the specific protocols and requirements for the program. Thus, based on the evidence presented, the impact that such a program might have on the reasonableness of Pratt's conduct is speculative. The trial court suggested that Pratt could have applied for a camping permit. However, no evidence was presented regarding the availability of such permits or whether Pratt's asserted purpose to engage in customary and traditional native Hawaiian practices would be considered.