***This is a nonprecedential memorandum opinion pursuant to ORAP 10.30 and may not be cited except as provided in ORAP 10.30(1).***

Submitted April 13, reversed and remanded September 8, 2022

Ryan M. MANG,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT
and Morrison Gederos LLC,
*Respondents.*

Employment Appeals Board
2021EAB0399; A176526

Emily S. Hill filed the brief for petitioner.

No appearance for respondents.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

Claimant seeks review of an order of the Employment Appeals Board reversing an order of an administrative law judge (ALJ) and holding that claimant was disqualified from receiving unemployment benefits because he left work voluntarily without good cause. ORS 657.176(2)(c) ("An individual shall be disqualified from the receipt of benefits *** if *** the individual *** voluntarily left work without good cause[.]"). Claimant contends that the board's order is not supported by substantial evidence or substantial reason, because the board failed to explain its rejection of evidence concerning the median wage for a carpenter. In reviewing the board's order for substantial evidence and substantial reason, ORS 657.282; ORS 183.482(8)(c), we agree with claimant that the board erred and therefore reverse and remand.

The facts are largely undisputed. We draw our summary from the board's order and the undisputed evidence in the record. *Campbell v. Employment Dept.*, 245 Or App 573, 575, 263 P3d 1122 (2011).

Claimant began working for employer as a carpenter in 2014, at a wage of $16.00 per hour. In 2016, claimant's wage increased to $17.50 per hour, and in 2018, his wage increased to $19.00 per hour. As a lead carpenter, claimant began supervising jobs and ordering materials for the employer. In 2020, employer began paying claimant $24.00 per hour.

During the course of claimant's employment, claimant cared for his disabled wife and ill child, driving them to their medical appointments and providing for their special needs. Claimant was often required to miss work to help his family.

On June 15, 2020, employer gave claimant a job evaluation that included the critique that claimant "does not report (ask for permission to leave work early)." Employer told claimant that the behavior "will have to be changed immediately."

During the week of August 24 to August 28, 2020, claimant notified one of employer's two owners that he was unable to work due to a family emergency. The other owner

became upset with claimant's absences, explaining that employer needed claimant, a supervisor, at the job site.

After claimant did not return to work on August 31, employer sent claimant a text message:

> "As we have discussed with you at the beginning of the year, with the raise you would have to be a supervisor on the job site. The raise would require more from you and you would have to change your behavior and habits. On June 19 of this year, we clearly gave you another chance to change and retain your supervising status and pay. With your recent behavior in the last few months, especially in the [last] 2 weeks, [you are] not able to be in a supervisor role. Effective immediately, we request return of company property. Tools, work truck, and credit card. As we have already arranged to be picked up from your house today at 1:00 PM due to your inability to return to the company shop. We are offering you a job at the position you were hired to do. Please contact us within 1 [week's] time for employment opportunities."

Claimant testified that an employee came to claimant's home to pick up employer's truck, tools, credit card, and keys to the shop, and told claimant that he had been fired the previous week. Claimant thus initially believed that he had been discharged from employment.

But claimant later realized that, although employer intended to demote him from his supervisory position, it also intended to offer him a nonsupervisory position at a lower wage of $19 per hour. Claimant told one of employer's owners that he would not work for $19 per hour. He did he not return to work and did not contact employer.

Claimant sought unemployment benefits. In an administrative decision, the Employment Department determined that claimant had voluntarily terminated his employment with good cause. Employer requested a hearing, contending that claimant had voluntarily left work without good cause. ORS 657.176(2)(c) (disqualifying a person from obtaining unemployment benefits if the individual "[v]oluntarily left work without good cause"). An ALJ agreed with employer and determined that claimant had voluntarily terminated his employment without good cause.

Claimant appealed to the board. The board agreed with the ALJ that claimant had left work voluntarily. We conclude that that finding is supported by substantial evidence. But the board did not believe that the record was sufficient to determine whether claimant had had good cause for voluntarily leaving work. Good cause is an objective standard that requires a determination that "a reasonable and prudent person" would consider the situation so grave that they had no reasonable alternative to quitting. *Warkentin v. Employment Dept.*, 245 Or App 128, 132, 261 P3d 72 (2011); *see also McDowell v. Employment Dept.*, 348 Or 605, 612, 236 P3d 722 (2010). The employee bears the burden of proof under ORS 657.176(2)(c) to show that there was good cause to leave work. *Henley v. Employment Dept.*, 284 Or App 781, 783, 395 P3d 55 (2017); *Young v. Employment Dept.*, 170 Or App 752, 13 P3d 1027 (2000).

ORS 657.195 provides:

"(1) Notwithstanding any other provisions of this chapter, no work is deemed suitable and benefits shall not be denied under this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"(a) If the position offered is vacant due directly to a strike, lockout or other labor dispute.

"(b) If the remuneration, hours or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality."

OAR 471-030-0038(4) provides, as relevant:

"(4) Good cause for voluntarily leaving work under ORS 657.176(2)(c) is such that a reasonable and prudent person of normal sensitivity, exercising ordinary common sense, would leave work. * * * Except as provided in OAR 471-030-0038(5)(g), for all individuals, the reason must be of such gravity that the individual has no reasonable alternative but to leave work."

The board reasoned in its first order that, considering claimant's family circumstances, "a grave situation for claimant

still may have existed for purposes of applying OAR 471-030-0038(4), if the rate of pay for the new position of carpenter was substandard under the Department's wage data." Thus, whether claimant left work without good cause, the board determined, turned on whether the $19 per hour wage that employer offered claimant was substantially less favorable to claimant than that prevailing "for similar work in the locality."

The board therefore remanded the matter to the ALJ for further development of the record about the suitable wages for a carpenter in the labor market area where claimant worked.[1] The ALJ convened a second hearing and took testimony from Kathy Copfer, an analyst for the department, who testified that the median wage for a carpenter in claimant's labor market area is $22.34 per hour.

On cross examination, employer's representative asked Copfer whether the median wage for claimant's market area distinguished between "union and non-union" wages or "prevailing and non-prevailing" wages. Copfer answered that the median wage information does not make such distinctions. Employer's representative then testified that, although the wage of $22.34 is in line with wages paid in Eugene, it is not in line with wages in the south coast area, where employer was located. In essence, employer challenged the applicability of the department's statistics.

---

[1] The board explained:

"The Department's wage information research data appears to show that the occupational profile applicable to claimant was 'Carpenter' and that the proposed wage of $19.00 per hour for such work in claimant's likely labor market of Coos County was ten percent or more below the median rate of pay for similar work in that labor market area, $22.34 per hour. Given the uncertainty of that match in the Department's data, and that generally the median rate of pay for an occupation in a labor market is determined by employees of the Employment Department adjudicating office, the Office of Administrative Hearings should send notice of the remand hearing to the Department, and direct the Department to provide a representative as a witness at the hearing on remand. The ALJ can then make an appropriate inquiry into the correct occupational profile for claimant's work and establish the median wage for that work in claimant's labor market. With that information, a full inquiry under OAR 47-030-0038(4) can be conducted to determine whether claimant's situation was sufficiently grave for him, given his family's circumstances, that claimant had no reasonable alternative but to quit work when he did due to the reduction in his wage rate."

The ALJ nonetheless found the department's data to be persuasive:

"Because the preponderance of the evidence reflects that claimant left 'unsuitable' work to seek 'suitable' work (in terms of remunerations being less favorable working for the employer), having faced a grave situation, he voluntarily left work with good cause. Therefore, the claimant is not disqualified from receiving unemployment insurance benefits."

The board reversed the ALJ's order. The board found:

"(7) The Department maintained data on the median wages for various types of occupations by labor market area. Based on Department data, the median wage rate for carpenters in claimant's labor market area of Coquille, Coos Bay, and the southern Oregon coast area in August of 2020 was $22.34 per hour. The data the Department maintained did not distinguish between union and non-union wages or wages for residential and commercial construction.

"(8) The employer engaged primarily in non-union, residential construction jobs in claimant's labor market area and had performed such work since 2007. Based on the employer's experience, the nonunion wage rate for carpenters engaged in residential construction in claimant's labor market area of $19 per hour was more typical than the Department's median wage rate for carpenters in claimant's labor market of $22.34 per hour."

Although the board had remanded the case to the ALJ for evidence concerning the median wage in claimant's own labor market area, the board did not believe that it was bound by the median wage data. Based on the fact that the department's data "did not distinguish between union and nonunion wages or wages for residential and commercial construction," the board found more persuasive employer's testimony that $19 per hour for a construction carpenter was more typical of the south coast labor market.

The board thus rejected the very data that it had requested. The necessary inference drawn by the board was that union employees are paid more than nonunion employees and that employees working on commercial projects are

paid more than employees who work on residential projects. The board concluded:

> "Viewed objectively, the evidence in the record fails to show that the employer's offer of the reduced wage of $19.00 per hour was 'substantially less favorable' to claimant than that prevailing for similar work in the locality, as required by ORS 657.195."

Thus, the board held, "the record fails to show that under that statute, the carpenter work offered to claimant for $19.00 per hour was 'unsuitable.'" The board therefore concluded that, having failed to accept suitable employment, claimant had not met his burden to show that he had good cause for voluntarily quitting. For the reasons explained below, we conclude that the board's order is not supported by substantial evidence or substantial reason.

We explained the substantial evidence standard for review in *Armstrong v. Aten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988):

> "If an agency's finding is reasonable, keeping in mind the evidence against the finding as well as the evidence supporting it, there is substantial evidence. That is not what has been referred to as the 'any evidence' rule but it is also not *de novo* review. For instance, and in a context which is likely frequently to occur in workers' compensation cases, if there are doctors on both sides of a medical issue, whichever way the Board finds the facts will probably have substantial evidentiary support. We would not need to choose sides. The difference between the 'any evidence' rule and the substantial evidence test in ORS 183.482(8)(c) will be decisive only when the credible evidence apparently weighs overwhelmingly in favor of one finding and the Board finds the other without giving persuasive explanation."

*Id.* at 206. The key take-away from *Armstrong* is that, to be supported by substantial evidence, an agency's order must indicate the agency's findings and how those findings lead the agency to its ultimate conclusion. *Guild v. SAIF*, 291 Or App 793, 796, 422 P3d 376 (2018).

A superficial reading of *Armstrong* might lead one to conclude that, when there are two opposite opinions, substantial evidence will support a decision either way. After

all, we said, "The difference between the 'any evidence' rule and the substantial evidence test in ORS 183.482(8)(c) will be decisive only when the credible evidence apparently weighs overwhelmingly in favor of one finding and the Board finds the other without giving persuasive explanation." 90 Or App at 206. Nevertheless, as the substantial evidence test has developed since *Armstrong*, it requires a deeper analysis of the record, to determine whether the agency's opinion is internally consistent. When reviewing for substantial evidence and substantial reason, our role is "to determine whether [the] record, viewed as a whole, is capable of being read as the agency read it." *Pullman v. Employment Dept.*, 238 Or App 60, 64, 243 P3d 312 (2010).

We have reaffirmed the need for internal consistency in Employment Appeals Board orders regarding "good cause" for voluntary termination. *See Kay v. Employment Dept.*, 292 Or App 700, 703, 425 P3d 502 (2018) (stating that under ORS 183.482(8)(c), the court reviews an agency's findings of fact for substantial evidence in the record, and its conclusions drawn from those facts for substantial reason, meaning that the agency's conclusions must reasonably follow from the facts found).

In this case, the board's analysis falls short on two equally important fronts. First, the board made an analytical decision that it did not explain. *Armstrong*, 90 Or App at 206 ("The requirement of findings leads to a requirement that the agency state its reasoning. *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 227, 621 P2d 547 (1980)."). Although the board remanded the case for evidence of the median wage in claimant's labor market, the board chose to disregard that evidence in preference for evidence was not about the median wage at all.[2] The median

---

[2] OAR 471-030-0038(5)(d) provides:

"Reduction in rate of pay: If an individual leaves work due to a reduction in the rate of pay, the individual has left work without good cause unless the newly reduced rate of pay is ten percent or more below the median rate of pay for similar work in the individual's normal labor market area. The median rate of pay in the individual's labor market shall be determined by employees of the Employment Department adjudicating office using available research data compiled by the department.

wage is the wage at the midpoint of a distribution of wages, such that there are an equal number of wages above it and an equal number of wages below it. Employer's evidence of "practical experience" did not reflect a median wage. It did not necessarily consider union wages, nonresidential wages, and the prevailing wages. Employer's evidence also ignored wages paid to carpenters engaged on "public works" projects.[3] The board did not explain why it found that evidence more persuasive than the evidence of median wage that it had particularly sought out in determining whether claimant had established good cause for quitting his job to find higher paying wages.

The second problem with the board's order is an inconsistency between the evidence concerning the nature of employer's work and the specific construction projects in which claimant was engaged and the board's findings. The board found:

> "The record also shows that the employer engaged primarily in non-union, residential construction job in claimants labor market area and had performed such work since 2007."

But Stephen Gederos, one of employer's owners, testified:

> "[W]hen [claimant] started working for us, we were probably 80% residential, 20% commercial working, just learning how to get into that market, and we've been trying more and more, to shift to that market, to go more of a *** 50/50, if not more commercial because that's where the market is leading[.]"

---

"(A)  This section applies only when the employer reduces the rate of pay for the position the individual holds. It does not apply when an employee's earnings are reduced as a result of transfer, demotion or reassignment."

OAR 471-030-0038(5)(d) thus provides a formula for determining whether a person's departure from employment due to a reduction in wages is "good cause" based on the "median rate of pay," which is to be determined by the department. But OAR 471-030-0038(5)(d)(A) states that requirement applies only when the reduction in pay is due to a reduction at the same position and does not apply to a demotion. The board nonetheless requested information concerning the median rate of pay for a carpenter in the south coast labor market.

[3] At the hearing, employer testified that the wages for "public works" contracts or "prevailing wages" for carpenters in claimant's market area were $35.00 per hour.

In fact, the record requires the finding that, since 2014, when claimant started working for employer, employer's jobs have shifted from primarily residential work to fifty percent or more commercial construction by the time of claimant's voluntary termination.

Indeed, at the time of his termination, the record indicates that claimant was working on a commercial construction job with a public entity. Gederos testified:

> "I believe they were working on Dorms, so the Southwest Community College."

A review of the record also reveals that, in the year before working on the commercial contract with Southwestern Oregon Community College, claimant worked on another large commercial contract with a public entity that included construction of a 33,000 square foot building at the Coos County Fairgrounds in Myrtle Point.

Thus, on this second front as well, the substantial evidence test in ORS 183.482(8)(c) has not been satisfied, because the credible evidence weighs overwhelmingly in favor of the finding that employer was significantly engaged in commercial contracts involving public works, and the board found otherwise "without giving persuasive explanation." *Armstrong*, 90 Or App at 206. We therefore reverse and remand the board's order for reconsideration.

Reversed and remanded.